Scott Estate.

Argued September 27, 1973. Before JONES, C. J., EAGEN, O'BRIEN, POMEROY, NIX and MANDERINO, JJ.

*Lloyd H. Fuge,* for appellant.

*Thomas C. Jones,* for appellee.

OPINION BY MR. JUSTICE POMEROY, March 25, 1974:

James Kemp, executor of the estate of Missoura K. Scott, deceased, appeals from a final decree of the orphans' court division surcharging him with the value of a bank account which appellant and decedent had held as joint tenants with rights of survivorship.[1] The case was heard on petition of the appellee, Karen J. Marek, who was Mrs. Scott's granddaughter and residuary legatee under her will, to have the account declared an asset of the estate. The auditing judge granted the petition and entered a decree of distribution modifying the executor's account. The executor's exceptions were denied, and the decree was affirmed on the opinion of the auditing judge. This appeal followed.

The factual background of the case is as follows: appellant and Mrs. Scott were brother and sister. On April 14, 1970, Mrs. Scott was admitted to the intensive care unit of McKeesport Hospital with a kidney ailment which was diagnosed as terminal. During her five-day stay in the intensive care unit, she continuously received oxygen and intravenous injections. Visitors were permitted to see Mrs. Scott one at a time, and only for five minutes in each hour. Although she experienced physical discomfort, her mind remained clear during this period.

Sometime shortly after she entered the intensive care unit, Mrs. Scott signed a signature card provided by the McKeesport National Bank, authorizing the crea-

---

[1] The Surcharge was $3,677.63, being the balance on deposit in the account at the date of death of the decedent.

tion of the joint account in question. On April 16th, Kemp signed the same card in the presence of a bank officer and deposited funds of Mrs. Scott in the account. Mrs. Scott was taken out of intensive care on April 19th, and was released from the hospital in the middle of May. Sometime in May, Mrs. Scott asked Kemp to sell her automobile. He arranged for the sale, and deposited the proceeds in the joint account.[2] Mrs. Scott died in her home on June 1, 1970.

The creation of a joint account with rights of survivorship, evidenced by a signature card signed by both parties, is prima facie evidence of an inter vivos gift from the party funding the account to the other joint tenant. *Dzierski Estate,* 449 Pa. 285, 296 A. 2d 716 (1972); *Sivak Estate,* 409 Pa. 261, 185 A. 2d 778 (1962); *Berdar Estate,* 404 Pa. 93, 170 A. 2d 861 (1961); *Furjanick Estate,* 375 Pa. 484, 100 A. 2d 85 (1953). Appellee concedes that there is insufficient evidence of fraud or undue influence to establish the invalidity of the gift. She argues, however, that the facts adduced show that a confidential relationship existed between Kemp and Mrs. Scott at the time she signed the signature card, and that the burden of showing that the gift was a free, voluntary and intelligent act of Mrs. Scott is thus shifted to Kemp. *See Thomas v. Seaman,* 451 Pa. 347, 304 A. 2d 134 (1973); *Dzierski Estate, supra.* The auditing judge found that a confidential relationship did exist between Mrs. Scott and appellant, and that Kemp had failed to come forward with any evidence showing the absence of deception or undue influence in the transaction through which he

---

[2] There is no question that all the funds in the account came from Mrs. Scott. Appellee does not suggest that the account was a "convenience account", intended to facilitate the handling of Mrs. Scott's normal day-to-day expenses. So far as the record shows, no money was withdrawn from the account prior to Mrs. Scott's death.

became a joint tenant of the account. No specific findings of fact were made as a basis for the ultimate finding of a confidential relationship. Our review of the record convinces us that the evidence is insufficient to support such a conclusion.

The concept of a confidential relationship cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line. *See* 9 Wigmore, Evidence, §2053, at 364-366 (3d ed. 1940). The essence of such a relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other. With this in mind, each case must be analyzed on its own facts. "Perhaps all that can be said with certainty is that the normal rules respecting the burden of proof will not obtain where there is something in the relationship or circumstances of the donor and the donee that makes it doubtful that the normal presumption of a gift has any basis in reality." *Dzierski Estate, supra,* 449 Pa. at 290.

The bare fact that Kemp and Mrs. Scott were brother and sister does not, without more, place them in a relationship of confidentiality. In *Leedom v. Palmer,* 274 Pa. 22, 117 A. 410 (1922), plaintiffs challenged a deed conveying property from brother to sister. Upholding the deed, this Court remarked: "The mere existence of kinship does not, of itself, give rise to confidential relation such as would impose the burden of proof on the one receiving a gift to assert its validity. . . . Where undue influence and incompetency do not appear, and the relation between the parties is not one ordinarily known as confidential in law, the evidence to sustain a confidential relation must be certain; it cannot arise from suspicion or from infrequent or unrelated acts; care must be used not to confound acts springing from natural love and affection with confidential relations, and, while the line of demarcation

may in some cases be narrow, nevertheless, to sustain the integrity of gifts based on such affection in family relations, it is necessary the distinction should exist." *Id.*, at 274 Pa. 26. *See also Carson Estate*, 431 Pa. 311, 245 A. 2d 859 (1968) ; *Gerner v. Kespelher*, 351 Pa. 649, 41 A. 2d 860 (1945) ; *Funston v. Twining*, 202 Pa. 88, 51 A. 736 (1902).

By the same token, a business association may be the basis of a confidential relationship only if one party surrenders substantial control over some portion of his affairs to the other. Mere assistance in handling the details of business transactions, such as acting as agent for the collection of rents, *Union Trust Co. v. Cwynar*, 388 Pa. 644, 131 A. 2d 133 (1957), or translating business documents for a non-English speaker,, *Stanis v. Simpson*, 452 Pa. 57, 305 A. 2d 29 (1973), does not give rise to an inference of confidentiality. *See also Fuller v. Fuller*, 372 Pa. 239, 93 A. 2d 462 (1953). In the case at bar, Mrs. Scott took care of all her own household expenses. While Kemp did sell his sister's automobile, and also sold some stock for her, both transactions were initiated by Mrs. Scott's request. With regard to her automobile, she personally signed the certificate of title, effecting the transfer to the buyer. We see nothing here to suggest a confidential relationship between Kemp and Mrs. Scott.

Finally, appellee points to Mrs. Scott's physical disabilities as providing the basis for a confidential relationship. Physical limitations imposed on a party to a transaction by disease and advancing age do not by themselves create a confidential relationship with another; such limitations support an inference of confidentiality only insofar as they may bear on a party's capacity to understand the nature of the transaction in question. *Carson Estate, supra; Snoder v. Lenhart*, 363 Pa. 371, 69 A. 2d 382 (1949) ; *cf. Lochinger v. Hanlon*, 348 Pa. 29, 33 A. 2d 1 (1943). As we have already

noted, the evidence showed that Mrs. Scott's mental powers were undiminished during the time she was in intensive care. Appellee suggests, however, that Mrs. Scott could not have read the signature card at the time she signed it, because she normally wore glasses, and was not wearing them on the three occasions when appellee or her mother visited Mrs. Scott in the intensive care unit. Moreover, appellee points out that Mrs. Scott's signature on the card is cramped, and written on a slight downward slant. But the appearance of this signature is hardly surprising in view of Mrs. Scott's position, lying supine on a hospital bed with medical instruments attached to her arms and head. By the same token, it is not unreasonable to suppose that, finding herself in this position, Mrs. Scott might not choose to wear her eyeglasses unless there was something in particular she wanted to see. Moreover, the evidence is insufficient to support a finding that Mrs. Scott was unable to read without glasses.[3] We accordingly conclude that the order of surcharge was not warranted.

The decree of distribution is modified in accordance with this opinion; each party to pay own costs.

Mr. Justice ROBERTS took no part in the consideration or decision of this case.

_____

[3] The nature of Mrs. Scott's visual disability does not appear in the record.