Sandra J. BASILE and Laura Clavin, individually and on behalf of all others similarly situated, Appellants, (at 565)

v.

H & R BLOCK, INC., H & R Block Eastern Tax Services, Inc. and Mellon Bank (De) National Association, Appellees.

Sandra J. Basile and Laura Clavin, individually and on behalf of all others similarly situated, Appellees,

v.

H & R Block, Inc., H & R Block Eastern Tax Services, Inc. and Mellon Bank (De) National Association,

Appeal of: H & R Block, Inc. and H & R Block Eastern Tax Services Inc., Appellants. (at 710)

Sandra J. Basile and Laura Clavin, individually and on behalf of all others similarly situated, Appellants, (at 856)

v.

H & R Block, Inc., H & R Block Eastern Tax Services, Inc. and Mellon Bank (De) National Association, Appellees.

Sandra J. Basile and Laura Clavin, individually and on behalf of all others similarly situated, Appellees,

. v.

H & R Block, Inc., H & R Block Eastern Tax Services, Inc. and Mellon Bank (De) National Association, Appellees,

Appeal of: H & R Block Eastern Tax Services Inc., Appellants. (at 711)

Superior Court of Pennsylvania.

Argued Dec. 17, 1998.
Filed May 3, 2001.
Reargument Denied July 11, 2001.

with the trial court if they feel that such    briefing is necessary.

Steven E. Angstreich, Philadelphia, for Basile and Clavin.

Thomas L. Allen, Pittsburgh, for Mellon Bank.

N. Louise Ellingsworth, Kansas City, MO, for H & R Block.

Before JOHNSON, MONTEMURO *, JJ., and CIRILLO **, President Judge Emeritus.

JOHNSON, J.:

¶ 1 In this appeal we consider whether evidence produced by the parties in discovery is sufficient to demonstrate a confidential relationship between the plaintiff class of Pennsylvania taxpayers (Plaintiffs) and mass-market tax preparer H & R Block, Inc., and H & R Block Eastern Tax Services, Inc., (Block). *See* Pa.R.C.P. 1035.2(2). The trial court determined that the evidence was insufficient to demonstrate a confidential relationship and so, granted summary judgment in favor of Block. We conclude that the trial court erred as a matter of law in determining the applicable legal standard for confidential relations. Additionally, we conclude that the evidence, when considered in view of the appropriate legal standard, is legally sufficient to make a *prima facie* showing that a confidential relationship existed between the Plaintiffs and Block during the period of time at issue in this case. We determine accordingly that the court abused its discretion in granting summary judgment and we reverse the court's order.

¶ 2 Between 1990 and 1993, Plaintiffs Sandra J. Basile and Laura Clavin retained Block to prepare their federal and state income tax returns and obtain tax refunds from the Internal Revenue Service. Subsequently, Basile and Clavin (Plaintiffs) filed a class action complaint, alleging that during the tax preparation process Block enlisted their participation in its "Rapid Refund" service and did not disclose that their "rapid refunds" were, in fact, short-term, high-interest loans (loans) secured by the taxpayers' pending refunds. Plaintiffs alleged further that Block shared in the interest and fees collected on the loans but did not apprise them of its financial interest. The Plaintiffs contend, accordingly, that Block secured their participation in the "Rapid Refund" service on the basis of false pretense, as a consequence of which they paid interest ranging from a low of 32% to a high of 151%, based on the amount of the loan. Accordingly, Plaintiffs asserted causes of action for Violation of the Truth in Lending Act, 15 U.S.C. § 1638; Fraud; Negligent Misrepresentation; Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201–2 through 201–9.2 (UTPCPL); Violation of the Delaware Legal Rate of Interest, 6 Del.Code § 2301(a); and Breach of Fiduciary Duty. In support of their assertion of fiduciary duty, Plaintiffs alleged that their relationship with Block was confidential in nature, and/or that Block had acted as an agent in preparing their tax returns and obtaining their "rapid refunds."

¶ 3 Subsequently, Block and co-defendant Mellon Bank, N.A., served notice of removal of the case to the United States

* Retired Justice assigned to Superior Court.
** Did not participate in the decision of this case.

District Court for the Eastern District of Pennsylvania (U.S.D.C.) on the basis of federal diversity jurisdiction. The federal court dismissed Plaintiffs' Truth in Lending and interest rate claims and remanded the matter to the Court of Common Pleas for disposition of Plaintiffs' state law claims. *See Basile v. H & R Block, Inc.*, 897 F.Supp. 194, 199 (E.D.Pa.1995) (*Basile I*). In state court, the Plaintiffs requested class action certification. The court denied certification of Plaintiffs' fraud, misrepresentation, and UTPCPL claims, but granted certification of their claim of breach of fiduciary duty. The court delineated the class as:

> All Pennsylvania residents who, while having their tax returns prepared by Block, applied for and received a "Rapid Refund" of their federal tax refund during the years 1990 through 1993 through Block's Rapid Refund Anticipation Loan Program at Block's offices or places of business located in the Commonwealth of Pennsylvania.

Order of Court, 5/30/97, at 2. The court certified plaintiff Sandra Basile as class representative, but declined to so certify Laura Clavin, concluding that Clavin, as employee of class counsel, was subject to a conflict of interest.

¶ 4 Subsequently, the Plaintiffs and Block filed cross-motions for summary judgment. Block challenged Plaintiffs' fiduciary duty claim, asserting that the evidence failed to establish either an agency or confidential relationship between the parties. The court granted Block's motion and denied Plaintiffs' cross-motion, concluding, *inter alia*, that "[t]he extent of [class representative Sandra Basile's] contact with Block during the preparation and filing of her tax returns speaks to the lack of confidential relationship defined by law." Memorandum Opinion and Order, 12/31/97, at 7. Plaintiffs appealed from the court's order granting summary judgment on their claim of breach of fiduciary duty, as well as from certain provisions of the prior class certification order. We addressed Plaintiffs' appeal, as well as a cross-appeal filed by Block and Mellon, and rendered an Opinion in *Basile v. H & R Block, Inc.*, 729 A.2d 574 (Pa.Super.1999) (*Basile II*). We determined that evidence adduced by the Plaintiffs in discovery established an agency relationship between the Plaintiffs and Block as a matter of law, as a consequence of which Block owed all members of the plaintiff class a fiduciary duty extending to all matters within the scope of the tax preparer-taxpayer relationship. *See id.* at 582. Accordingly, we concluded that the trial court had abused its discretion in granting Block's motion for summary judgment and remanded the matter to the trial court for consideration of issues of fact. *See id.* We concluded also that the court had erred in refusing to certify the Plaintiffs' UTPCPL claims to proceed as a component of the class action. *See id.* at 584. We did not address the Plaintiffs' assertion that Block owed members of the plaintiff class a fiduciary duty arising from a confidential relationship.

¶ 5 Thereafter, Block sought review of our decision in the Supreme Court of Pennsylvania, limited to the issue of whether Block owed a fiduciary duty to the members of the plaintiff class by reason of an agency relationship. The Supreme Court granted allowance of appeal limited to the issue of "the propriety of the Superior Court's conclusion that an agency relationship existed between [the plaintiff class] and Block such that [the plaintiff class] may pursue a claim that Block breached its fiduciary duties to them." *Basile v. H & R Block, Inc.*, 563 Pa. 359, 761 A.2d 1115, 1118 (Pa.2000) (*Basile III*). Upon review, the Supreme Court found that "[t]he pleadings here do

not establish an agency relationship," *id.* at 1121, and held as a matter of law that "Block was not acting as appellees' agent in the RAL [loan] transactions, such that they were subject to a heightened, fiduciary duty." *Id.* Accordingly, the Court vacated our order and remanded the matter for consideration of the Plaintiffs' alternative argument that "even if a principal-agent relationship did not exist, Block owed appellees a fiduciary duty as a result of a confidential relationship." *Id.* at 1122. The Court directed that we consider the confidential relationship issue "in the first instance." *See id.* at 1123.

¶ 6 Additionally, Plaintiffs request that we revisit our prior determination, *see Basile II,* and that we address whether the trial court erred in refusing to apply a presumption of reliance for purposes of establishing private causes of action under the UTPCPL independent of the question of confidential relationship. Supplemental Brief in Support of Plaintiffs' Appeal on Remand at 3. We conclude, however, that our Supreme Court's remand limits our jurisdiction to the scope of the question framed in *Basile III* and precludes our consideration of the additional questions the Plaintiffs raise. *See Scott v. Pennsylvania Bd. of Probation and Parole,* 739 A.2d 1142, 1145 (Pa.Cmwlth.1999) (recognizing that, upon remand, intermediate appellate court may address only issues designated by Supreme Court). Consequently, we limit our review to "consideration of the confidential relationship issue in the first instance." *Basile III,* 761 A.2d at 1122–23. Thus, we have limited our review to determine whether the trial court erred in granting summary judgment on the question of confidential relations.

¶ 7 The trial court granted summary judgment premised on the conclusion that the Plaintiffs failed to adduce suffi-cient evidence to demonstrate a confidential relationship between themselves and Block. Memorandum Opinion and Order, 12/31/97, at 7. To review the propriety of the court's ruling, we look initially to the Rules of Court governing summary judgment. Rule 1035.2 establishes the bases for summary judgment as follows:

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law
>
> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
>
> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2. Accordingly, "[a] proper grant of summary judgment depends upon an evidentiary record that either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense[.]" *McCarthy v. Dan Lepore & Sons Co., Inc.,* 724 A.2d 938, 940 (Pa.Super.1998). Under Rule 1035.2(2), "if a defendant is the moving party, he may make the showing necessary to support the entrance of summary judgment by pointing to materials which indicate that the plaintiff is unable to satisfy an element of his cause of action." *Godlewski v. Pars Mfg. Co.,* 408 Pa.Super. 425, 597 A.2d 106, 109 (1991). Correspondingly, "[t]he non-moving party must adduce sufficient evidence

on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict favorable to the non-moving party." *McCarthy,* 724 A.2d at 940. Where a plaintiff is the non-moving party, summary judgment is improper if the evidence, viewed favorably to the plaintiff, would justify recovery under the theory it has pled. *See Kelly v. Ickes,* 427 Pa.Super. 542, 629 A.2d 1002, 1005 (1993).

¶ 8 "This Court's scope of review of an order granting summary judgment is plenary." *Basile III,* 761 A.2d at 1118. Accordingly, we must consider the court's order in the context of the entire record. *Basile II,* 729 A.2d at 579, *vacated in part and remanded on other grounds,* 563 Pa. 359, 761 A.2d 1115 (2000). Our consideration is not limited to the pleadings but includes, as well, depositions, interrogatories, responses to requests for admissions, and affidavits filed by the parties. *See White v. Owens–Corning Fiberglas Corp.,* 447 Pa.Super. 5, 668 A.2d 136, 142 (1995) (citing *Penn Center House v. Hoffman,* 520 Pa. 171, 553 A.2d 900, 903 (1989)). "Our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or clearly abused its discretion." *Basile III,* 761 A.2d at 1118. Because, in this case, the trial court premised its order on Rule 1035.2(2), we must discern, in the first instance, whether the court committed an error of law in determining and applying the legal standard for confidential relations.

¶ 9 Our Supreme Court has acknowledged that "[t]he concept of a confidential relationship cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line." *In re Estate of Scott,* 455 Pa. 429, 316 A.2d 883, 885 (1974). The Court has recognized, nonetheless, that "[t]he es-

sence of such a relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other." *Id.* Accordingly, "[a confidential relationship] appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, *or,* on the other, weakness, dependence or trust, justifiably reposed[.]" *Frowen v. Blank,* 493 Pa. 137, 425 A.2d 412, 416–17 (1981) (emphasis added). The Supreme Court's use in *Frowen* of the disjunctive "or" to separate the cognizable characteristics of confidential relation is critical. Contrary to the trial court's determination in this case, our law does not require both "over[mastering] influence *and,* . . . weakness, dependence or trust." *See* Memorandum Opinion and Order (Trial Court Opinion), 12/31/01, at 6 (emphasis added). Indeed, both elements need not appear together as "in both an unfair advantage is possible." *Frowen,* 425 A.2d at 417.

¶ 10 If parties are engaged in a confidential relationship the apparent disparity in their positions serves as the foundation for the law's expectation of conduct between the parties and the concomitant obligations of the superior party. "[T]he party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage." *Young v. Kaye,* 443 Pa. 335, 279 A.2d 759, 763 (1971). As a consequence of the superior party's heightened state of duty "normal arm's length bargaining is not assumed." *Frowen,* 425 A.2d at 416. "This is so because the presence of a confidential relationship negates the assumption that each party is acting in his own best interest." *Id.*

¶ 11 The Supreme Court has determined that a confidential relationship

and the resulting fiduciary duty may attach "wherever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Brooks v. Conston*, 356 Pa. 69, 51 A.2d 684, 688 (1947), *quoted in Biddle v. Johnsonbaugh*, 444 Pa.Super. 450, 664 A.2d 159, 162 (1995). "In some cases, as between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent, the existence of a confidential relationship is a matter of law." *In re Estate of Mihm*, 345 Pa.Super. 1, 497 A.2d 612, 615 (1985). In other cases, where these relationships do not exist, confidential relations may still arise based on the facts and circumstances apparent on the record. *See id*. Both our Supreme Court and other courts have recognized that those who purport to give advice in business may engender confidential relations if others, by virtue of their own weakness or inability, the advisor's pretense of expertise, or a combination of both, invest such a level of trust that they seek no other counsel. *See Frowen*, 425 A.2d at 418; *Young*, 279 A.2d at 763; *Brooks*, 51 A.2d at 688. *See also Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992) (If a person solicits another to trust him in matters in which he represents himself to be expert as well as trustworthy and the other is not expert and accepts the offer and reposes complete trust in him, a fiduciary relation is established).

¶ 12 Although the language used to define such advisor/advisee relationships has varied over time and in response to the circumstances established by the record, the Pennsylvania Supreme Court has focused, consistently, on the disparity in position between the parties to determine whether their relationship is, in fact, confidential. *See Weir by Gasper v. Ciao*, 521 Pa. 491, 556 A.2d 819, 825 (1989) (stating that a confidential relationship "is created between two persons when it is established that one occupies a superior position over the other; intellectually, physically, governmentally, or morally, with the opportunity to use the superiority to the other's disadvantage"). *See also Frowen*, 425 A.2d at 418 (quoting Restatement of Trusts 2d, § 2(b)) ("[a] confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind").

¶ 13 Moreover, the Court's decisions suggest that disparity between the respective parties is to be adjudged subjectively, and may occur anywhere on a sliding scale of circumstances. Thus, in *Frowen*, the Court concluded that a confidential relationship existed between an elderly widow who sold her farm to a neighbor friend, not because the neighbor demonstrated any particular level of strength or business savvy, but because the widow demonstrated weakness and trust. *Id*. The Court recognized specifically that she was aged and infirm and "had no more than two or three years of formal education and little knowledge of business matters." *Id*. at 417. Similarly, the Court recognized a confidential relationship in *Young* based on the same sort of disparity, notwithstanding that the "inferior" party was the former president of a utility company and the "superior" party was his former employee. *See* 279 A.2d at 763. In *Young*, the court concluded that the plaintiff's former employee, an accountant who acted as the plaintiff's tax consultant, had assumed the superior role in a confidential relationship because, *inter alia*, the plaintiff "possessed no apparent knowledge of the intricacies of the federal personal and corporate income tax laws and had no independent advice on such matters[.]" *Id*. The Court also considered significant the

fact that Young reposed a level of trust in his consultant such that he often signed "without question" tax and other financial documents his consultant had prepared. *Id.* We conclude that these cases, when considered together and in conjunction with prior authority, compel recognition of confidential relations between parties in a wide array of individual circumstances. The possibility of a confidential relationship cannot be excluded by a concrete rule. So long as the requisite disparity is established between the parties' positions in the relationship, and the inferior party places primary trust in the other's counsel, a confidential relationship may be established.

¶ 14 In view of our Supreme Court's pronouncements defining the parameters of confidential relationships, we conclude initially that the trial court erred as a matter of law in determining what the Plaintiffs' evidence needed to show to defeat a motion for summary judgment. As noted above, the court granted judgment in favor of Block, relying for its determination on an erroneous restatement of the applicable standard by a panel of this Court in *Rebidas v. Murasko*, 677 A.2d at 334. *Rebidas* appears to require a demonstration of *both* the superior party's "overwhelming influence" *and* the inferior party's "weakness, dependence or trust." *Id.* at 334. Such language is clearly inconsistent with our Supreme Court's prior definition of the legal standard for confidential relations. Contrary to the language in *Rebidas,* our Supreme Court determined in *Frowen* that a confidential relationship may be established by evidence of either "overmastering influence" *or* of "weakness, dependence or trust." *See Frowen,* 425 A.2d at 416–17. *Frowen* is the original authority from which the statement in *Rebidas* derives. *See Rebidas,* 677 A.2d at 334 (quoting *Biddle v. Johnsonbaugh,* 444 Pa.Super. 450, 664 A.2d 159, 162 (1995)

(citing *Frowen,* 425 A.2d at 416)). The Supreme Court has not issued a subsequent holding modifying the standard stated in *Frowen. Cf. Weir,* 556 A.2d at 825 (restating, in *dicta,* disjunctive standard applied in *Frowen* ). We are compelled to conclude accordingly that the trial court erred in relying on *Rebidas,* and adjudged the sufficiency of the Plaintiff's evidence by combining two elements the combination of which is repudiated by our Supreme Court's holdings.

¶ 15 Upon application of the proper standard of confidential relationship, *see Frowen,* 425 A.2d at 416; *Scott,* 316 A.2d at 885; *Young,* 279 A.2d at 763; *Brooks,* 51 A.2d at 688, we conclude that the evidence adduced in this case is sufficient to make a *prima facie* showing that the Plaintiffs and Block engaged in a confidential relationship. As a starting point, the evidence suggests that Block actively sought customer trust in H & R Block as a corporate entity and in all of the services Block offered. During deposition, Block's Assistant Vice President and Director of Field Operations made Block's objective clear:

Q. Could you describe for me in your words how you view the relationship between an H & R Block tax preparer or H & R Block the corporation for that matter and those individual clients that Block has?

A. I'm not—I'm not sure how to address your question. I believe that what we are providing are professional services that are on par with the services provided by some accountants and some lawyers who offer tax preparation service. We are handling highly confidential information. We are dealing with very sensitive information in the sense that this is the taxpayer's income

and tax liability that we're talking about. We have to ask a lot of probing questions and we ... receive a lot of personal information. We try to establish an element of trust and we try to instill in the mind of our client that we are professional and competent in what we do, that we provide professional services,....

Brief for Appellant at 29 (quoting Deposition of Edward B. Feinstein, 8/6/97, at 126–27).

¶ 16 Further evidence tends to demonstrate that Block cultivated customer trust through an extended and extensive media ad campaign, the focal point of which was Block's expertise in tax matters and the trustworthy character of Block's services. During the 1990 tax season, Block's ads both suggested specialized expertise, *("Income taxes are all we do")*, Reproduced Record (R.R.) at 3481a–88a, and encouraged its customers to depend on Block, *("We're here when you need us")*, *id.* Subsequent ads reinforced these concepts in 1991, *("We're prepared to help you with any type of tax situation")*, *id.* at 3485, and in 1993, *("Income Taxes are all we do. Let America's team take the worry out.")*, *id.* at 3481a. In its Spanish language television commercials, Block elicited an image of family, declaring that "confiding in H & R Block ... is like ... being able to confide in one of your own." Spanish Ad Copy (Plaintiffs' Appendix to Memorandum of Law in Opposition to H & R Block Defendants' Motion for Summary Judgment and in Support of Plaintiff's [sic] Cross Motion for Summary Judgment, tab 19). Block's print brochures invited existing customers even to consult Block on matters ostensibly *outside the realm of taxation,* stating "We want you to contact us if you have any questions about your tax return, next year's taxes or *for any reason at all.*" Client Copy Letter (Appendix of Plaintiffs' Brief in Opposition to Defendant's Motions for Summary Judgment, tab 24) (emphasis added).

¶ 17 Additional evidence, in the form of Block's "confidential" marketing data, suggests that many of Block's customers entered their relationships with Block in a position of pronounced economic and intellectual weakness. H & R Block Focus Group Studies HRB 489–491 (Appendix of Plaintiffs' Brief in Opposition to Defendant's Motions for Summary Judgment, tab 22). Data collected from Block's "Metropolitan Mix" focus group established that a significant segment of the company's customers were those of $10,000 to $15,000 annual income, unemployed or employed in service occupations, and possessed of less than a high school education. *Id.,* Focus Group Study HRB 489. Another marketing survey apprised Block that those who used the "Rapid Refund" service, in particular, were frequently in economic straits and used Block's services to obtain cash to meet pressing personal needs as soon as possible. *Id.,* Focus Group Study HRB 4934. The following excerpt is illustrative:

*User Group Results*

1. *Why Did They Use Rapid Refund? Most used Rapid Refund because they had a specific, immediate need for the money:* the car broke down and had to be repaired/replaced; the money was needed for a vacation, down payment on a car, to pay off bills ...

2. Getting a refund is a desired annual event for most of these clients. While they don't plan specifically how much they are going to get back, they do have enough taken out so they don't have to pay at tax time.

   *Most of these people feared having to pay, simply because they don't have the money.* Those who use credit

cards, which is almost all of the group, pay off the minimum they have to each month.

*Id.* (emphasis added).

¶ 18 Sandra Basile's testimony about her own circumstances corroborates Block's marketing data. Basile testified that she did not graduate from high school and worked as a waitress in a diner. Deposition of Sandra J. Basile, 11/17/93, 11–12. She worked 17–20 hours per week at two dollars per hour and collected tips during each week of between $75 and $100. *Id.* at 15–16. Her other income consisted of $300 to $400 monthly support from a former husband and a social security check for the support of her handicapped daughter. *Id.* at 25–26.

¶ 19 Basile sought Block's assistance with her taxes in response to Block's ads, of which she was keenly aware, because she wanted to get money back as soon as possible. Basile Deposition at 32–33. However, she was not aware of distinctions between the types of service Block offered and did not request a "Rapid Refund," but merely appeared at Block's office expecting to have her tax return completed. *Id.* at 32–34. Moreover, Basile's testimony suggests that she trusted Block almost without reservation. She did not talk to anyone else about filing her tax return, *id.* at 32, and after Block's tax preparer completed her return she signed the papers he proffered without question. *Id.* at 38–40. Correspondingly, the tax preparer offered no explanations, but instead presented Basile with a sheaf of forms, flipping the pages and directing her where to sign. *Id.* Basile acknowledged that she would not normally sign legal or business documents without first reading them; on this occasion, however, she did so because the Block representative told her what to do. *Id.* at 55–57. Significantly, Basile attested that she did not know that her "refund"

check was in fact a loan until, during her divorce proceedings in 1992, her divorce lawyer brought the matter to her attention. *Id.* at 25–26. Even then, she insisted that she had not received a loan. *Id.* at 26.

¶ 20 Basile's recollection of her experiences is corroborated as to other class members, again, by Block's own marketing data. The study discussed *supra* demonstrates that Block's clients were confused by the Rapid Refund service and that Block was aware of their confusion:

3. *Knowledge About How Rapid Refund Works*

*There is a lot of confusion about how Rapid Refund works and how much it costs.*

Many [clients] were not aware (or just didn't include) the fee deducted from their refund check.

\* \* \*

Some were worried about how/if it would work—was it legitimate—was the government involved. *The bank's involvement was clear to some, not to others.*

H & R Block Focus Group Study HRB 4934 (Appendix of Plaintiffs' Brief in Opposition to Defendant's Motions for Summary Judgment, tab 22) (emphasis added). The same study apprised Block that many consumers would decline to participate in the "Rapid Refund" service if they knew it was a loan. *Id.,* Focus Group Study 4938.

¶ 21 Notwithstanding the results of Block's marketing studies, the company instructed its tax preparers to provide minimal explanation of the "Rapid Refund" service. In 1990, Block's "Tax Preparer I Handbook" for "Prework Training" specified as follows:

As you explain the program, *your objective should be to tell the client what he*

*wants to know without getting bogged down in details that are unimportant to him.* We have found that the points listed below for each of the services are the most important to the client. *Do not provide additional information when explaining the program unless the client asks for further details.*

Tax Preparer I Handbook, 1990 HR 22620, 22625 (Plaintiffs' Appendix to Memorandum of Law in Opposition to H & R Block Defendants' Motion for Summary Judgment and in Support of Plaintiff's [sic] Cross Motion for Summary Judgment, tab 25) (emphasis added). The points that Block designated as "most important to the client" were limited to when the check would be available, what would be the amount of the fees, and whether the fees would be withheld from the check. *Id.*

¶ 22 We conclude that the foregoing evidence, viewed in the light most favorable to the Plaintiffs, *see Basile III*, 761 A.2d at 1118, is ample to demonstrate that they and Block did not deal on equal terms, but that Sandra Basile and members of the certified class sought Block's assistance from a position of pronounced intellectual and economic weakness. *See Frowen*, 425 A.2d at 416–17; *Weir*, 556 A.2d at 825. The plaintiffs have adduced a significant quantum of evidence, much in the form of internal Block documents, tending to demonstrate that Block's customers possessed limited education and suffered from chronic economic scarcity. The evidence suggests as well that Block encouraged these customers to repose a high level of trust in the company and that the Plaintiffs responded by placing their trust in Block, both to prepare their tax returns and to secure their tax refunds. Possessing no significant expertise in the services Block offered, *see Young*, 279 A.2d at 763, the Plaintiffs made no distinction concerning the role Block played in tendering the "Rapid Refund" service, but rather, like

Sandra Basile, merely sought the most expeditious way to comply with the tax laws and to recoup taxes they had overpaid. In point of fact, many of Block's customers had no significant understanding of the "Rapid Refund" service.

¶ 23 The evidence suggests further that Block recognized its customers' confusion and exploited "a corresponding opportunity to abuse [their] trust for personal gain." *In re Estate of Scott*, 316 A.2d at 885. As documented by multiple focus group studies commissioned by Block, the company was aware of the limited economic and educational standing of its customers, their confusion about the "Rapid Refund" service, and the fact that they trusted the company to "take the worry out." Notwithstanding this knowledge, the company, ostensibly, made no effort to provide a clear explanation of its services, but in Sandra Basile's case, merely told her where to sign. Thus, we conclude that the jury could reasonably find that Block occupied a position of substantial strength which, relative to the pronounced intellectual and economic weakness of the Plaintiffs, presented Block with the opportunity to abuse the Plaintiffs' trust for its own gain. Such a scenario is consistent with confidential relations as defined by our Supreme Court. *See Frowen*, 425 A.2d at 416–17 ("[A confidential relationship] appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed[.]"); *Brooks*, 51 A.2d at 688 (concluding that a confidential relationship may exist "wherever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest"); *Weir*, 556 A.2d at 825 (opining that a confidential relationship "is created

between two persons when it is established that one occupies a superior position over the other; intellectually, physically, governmentally, or morally, with the opportunity to use the superiority to the other's disadvantage").

¶ 24 In reaching our conclusion, we acknowledge that the typical case of confidential relationship in Pennsylvania has resulted from personal contact between two individuals, as the result of which one secures an advantage over the other, often by way of friendship. *See Frowen*, 425 A.2d at 418; *Young*, 279 A.2d at 763; *Brooks*, 51 A.2d at 688. Yet we recognize also that our Supreme Court has declined to establish any level of personal intimacy as a prerequisite for the creation of a confidential relationship. *See Young*, 279 A.2d at 763 (instructing that confidential relationship "is not restricted to any specific association of persons"). Thus, we find limited persuasive value in the trial court's reasoning that "[t]he extent of [class representative Sandra Basile's] contact with Block during the preparation and filing of her tax returns speaks to the lack of confidential relationship defined by law." Memorandum Opinion and Order, 12/31/97, at 7. Similarly, we find little significance in Block's assertions that the typical visit of a class member to an H & R Block office may have been less than one-half hour, or that some, like Sandra Basile, did not remember the name of the individual tax preparer who compiled his or her documents. The evidence suggests that the Plaintiffs trusted not the individuals who staffed any given Block office, but Block as an organization. Though Block, per force, could not establish a personal relationship with any member of the class, it sought nonetheless to achieve a false intimacy through carefully orchestrated advertising images. Brief for Appellant at 28 (repeating ad copy for televised promotion: "confiding in H & R Block ... is

like ... being able to confide in one of your own"). Moreover, the evidence suggests that Block's presence in the media was pervasive. Basile Deposition, at 33 ("You see it on TV commercials every ten minutes."). Were we to apply our caselaw in the manner Block suggests, requiring some level of personal intimacy for the formation of a confidential relationship, we would effectively elevate the economic concerns of the mass market above the mandate of the law. Such a decision would allow vast numbers of our more credulous citizens to suffer harm that we would repudiate if inflicted on an isolated basis by an individual.

¶ 25 Nonetheless, our holding is narrow. We do not conclude that the relationship of a tax consultant to his client is confidential *per se*, nor do we conclude that the parties here were engaged in such a relationship as a matter of law. We conclude only that the evidence before the trial court on summary judgment was sufficient to establish, *prima facie*, the elements of a confidential relationship between the parties in this case. If, upon remand, the factfinder accepts, as truthful, evidence adduced tending to demonstrate a confidential relationship, Block will be bound by a corresponding fiduciary duty as a matter of law. *See Young*, 279 A.2d at 763.

¶ 26 As we recognized in our prior disposition, *see Basile II*, 729 A.2d at 584, the obligations of a defendant bound by a fiduciary duty relieve the plaintiff of the burden to prove reliance in claims it asserts for violation of the UTPCPL. *Cf. Young*, 279 A.2d at 759 (stating that where fiduciary duty is established, general rule requiring affirmative showing of fraud is inapplicable). Accordingly, if upon remand the Plaintiffs succeed in demonstrating a confidential relationship with Block, their reliance, inherent in a finding of fiduciary duty, will be presumed for purposes of

claims under the UTPCPL. *See Basile II,* 729 A.2d at 584.

¶ 27 For the foregoing reasons we reverse the order of the trial court and remand this matter for further proceedings.

¶ 28 Order granting summary judgment **REVERSED.** Case **REMANDED** for further proceedings consistent with this Opinion. Jurisdiction **RELINQUISHED.**