Patrick ZATOR, Sr., Administrator of the Estate of Patrick Zator, Jr., Deceased, and Sharon Zator, Appellants

v.

Daniel COACHI, M.D., Edwin Feliciano, M.D., Christine Touch, Marian Community Hospital, Tri–County Human Services Center, Inc., Appellees.

Superior Court of Pennsylvania.

Submitted May 7, 2007.

Filed Nov. 28, 2007.

Reargument Denied Feb. 8, 2008.

William C. Kaczynski, Pittsburgh, for appellants.

Ronald M. Wabby, Jr., Asst. Dist. Atty., Pittsburgh, for the Com., appellee.

BEFORE: LALLY–GREEN, DANIELS, and JOHNSON, JJ.

OPINION BY JOHNSON, J.:

¶ 1 Patrick Zator, Sr., as Administrator of the Estate of Patrick Zator, Jr., and Sharon Zator, (collectively "Zator"), appeal the trial court's order granting summary judgment in favor of all defendants on grounds that plaintiff's evidence failed to satisfy the requisite standard of proof mandated by the Mental Health Procedures Act, (MHPA). *See* 50 P.S. § 7301, *et seq.* Zator contends that the trial court did not correctly interpret provisions of the MHPA that prescribe grounds for involuntary commitment based on self-mutilation and that, consequently, the court erred in determining that grounds for involuntary commitment to the defendant's

facility had not been shown. We conclude that the evidence adduced does not support the court's determination. Accordingly, we reverse its order and remand this matter for further proceedings.

¶ 2 This matter arises out of the tragic suicide of Zator's son, Patrick Zator, Jr., (Patrick) several days after personnel at the Marian Community Hospital (Marian) declined to commit him for mental health treatment on an involuntary basis pursuant to section 302 of the MHPA, 50 P.S. § 7302. Patrick was 25 years old on the date of his death. He first presented to Marian's emergency room on April 7, 2006, after family members called for help from the local police because Patrick had been repeatedly and forcefully striking his head on a porch post at his family's home. When the police arrived, they found one of Patrick's male family members pinning him to the ground in an effort to restrain him. Family members reported to the responding officer that Patrick had begun acting erratically at a family wedding that day and had asked to leave. While returning home with his girlfriend, he began to shake, and repeatedly punched himself in the face and head. Family members' subsequent testimony indicated that the multiple blows had caused parts of his face to begin swelling.

¶ 3 After Patrick had been calmed, Officer Frank Rapoch interviewed him away from his family and asked what was wrong, to which Patrick replied "everything." Officer Rapoch then asked about Patrick's conduct and whether he was going to "harm himself," to which Patrick responded "yes," but agreed that if taken to the hospital, he would commit himself voluntarily. When the two arrived at Marian, Officer Rapoch informed personnel that they could contact him with any questions they might have about Patrick and that if Patrick decided against a voluntary commitment, he would return to the hospital to file a petition of involuntary commitment under MHPA section 302. Patrick's family members and girlfriend also went to Marian and informed hospital personnel about his remarks and conduct, and voiced their suspicion that Patrick had recently attempted suicide, given the absence of an excessive number of pills from a bottle of prescription medication.

¶ 4 After Officer Rapoch departed from Marian, he received a call from defendant Christine Touch, a social worker for Tri–County Human Services Center, Inc., (Tri–County), a social service agency that provided mental health support services and screening for Marian. According to Officer Rapoch, Touch began the conversation by asking "Why did you bring this individual to me?", to which Rapoch replied "Because I felt he needed to be evaluated." Touch responded "Well, I just got done speaking with him and ... I'm going to send him home." Officer Rapoch told Touch that he "strongly disagreed" with her decision and that "if it made a difference" he would return to the hospital and fill out a police committal form. Touch declined the officer's further involvement, however, and told him that the decision was hers to make and that even if Rapoch prepared the commitment request, Patrick would be allowed to go home.

¶ 5 During the course of her discussion with Patrick, Touch contacted defendant Edwin Feliciano, M.D., a psychiatrist employed by Tri–County. Based upon the information Touch conveyed, Feliciano agreed that Patrick could be released from Marian. It is undisputed that neither Feliciano nor any other psychiatrist examined Patrick directly. Dr. Feliciano stated later at his deposition that Touch never informed him of Officer Rapoch's assessment or request for involuntary commitment or that Patrick had threat-

ened to harm himself. Consequently, no psychiatric treatment was provided or prescribed and Marian released Patrick, over his family's objections, with instructions from Touch to arrange for outpatient treatment on his own. Several days later, Patrick's family found him hanged, an electrical extension cord around his neck, with a suicide note nearby.

¶ 6 Zator commenced this action asserting wrongful death and survival claims. Following the deposition of all material witnesses and submission of expert reports, all defendants filed motions for summary judgment. The trial court, the Honorable Robert A. Mazzoni, granted the motions on the basis that Zator's evidence failed to raise a question of material fact under the MHPA because it failed to establish that he was a "clear and present danger to himself" as defined by section 301(b)(2). *See* 50 P.S. § 7301(b)(2). Zator then filed this appeal, raising the following questions for our review:

  A.  Whether a *prima facie* case has been demonstrated by the Pleadings, Reports, Depositions and complete record as to allow the case to be heard by a jury[?]

  B.  Whether the court misapplied the law when it stated that the Plaintiffs have to show "substantial mutilation" in order to overcome the Summary Judgment motion[?]

  C.  Whether the court applied the right definition to the term "mutilation[?]"

  D.  Whether there is a question of material fact that should be decided by a jury when the Plaintiff/Appellant expert opines that the Plaintiff/Appellant's decedent did substantially mutilate himself[?]

  E.  Whether the court should have considered the Defendants['] Summary Judgment Motion and Briefs when they were objected to by the Plaintiff/Appellant as being untimely pursuant to court order[?]

Brief for Appellant at 9.

¶ 7 Before proceeding, we note that Zator's fifth question challenges the Defendants' motions for summary judgment on procedural grounds, asserting that they were filed beyond the cutoff date established by the trial court's case management order. Brief for Appellant at 28. Thus, Zator's argument impugns the trial court's exercise of discretion in enforcing its own order. Zator fails, however, to explain on what legal grounds we might grant relief and offers no citation to appropriate authority. *See* Pa.R.A.P. 2119(a); *Estate of Haiko v. McGinley*, 799 A.2d 155, 161 (Pa.Super.2002). We conclude accordingly that he has failed to carry his burden of persuasion on this point and proceed to the remaining questions, which challenge the court's order on its merits. Because Zator's remaining questions require consideration of overlapping issues, we will address them together.

> This Court's scope of review of an order granting summary judgment is plenary. Accordingly, we must consider the court's order in the context of the entire record. Our consideration is not limited to the pleadings but includes, as well, depositions, interrogatories, responses to requests for admissions, and affidavits filed by the parties. Our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or clearly abused its discretion.

*Basile v. H & R Block, Inc.*, 777 A.2d 95, 101 (Pa.Super.2001) (internal citations and quotation marks omitted).

> [A] proper grant of summary judgment depends upon an evidentiary record that either (1) shows the material facts are

undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense[.] Under [Civil] Rule 1035.2(2), "if a defendant is the moving party, he may make the showing necessary to support the entrance of summary judgment by pointing to materials which indicate that the plaintiff is unable to satisfy an element of his cause of action." Correspondingly, [t]he non-moving party must adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict favorable to the non-moving party. Where a plaintiff is the non-moving party, summary judgment is improper if the evidence, viewed favorably to the plaintiff, would justify recovery under the theory it has pled.

*Id.* at 100–01.

¶ 8 In this case, the trial court granted summary judgment on the conclusion that Zator's evidence failed to raise a question of material fact that the defendants had been grossly negligent in refusing to commit Patrick pursuant to MHPA section 302. The court reasoned that the evidence was not sufficient to show that Patrick had or would "substantially mutilate" himself as prescribed by section 301(b)(2)(iii), and therefore could not show that he had been a "clear and present danger" to himself when discharged from Marian. Trial Court Opinion, 10/26/06, at 21. In support of his first question, Zator challenges the trial court's interpretation of section 301, arguing that the evidence available to the defendants collectively provided ample grounds for involuntary commitment had they chosen not to ignore it. Brief for Appellant at 16 ("The depositions of most parties are cluttered with references to [Patrick] threatening to commit suicide and/or mutilate himself."). Upon review of the record, we agree.

¶ 9 MHPA section 301 provides multiple grounds upon which a court may deem an individual a "clear and present danger" to himself and order his commitment for 48 hours' observation and treatment. Section 301 provides in pertinent part as follows:

**§ 7301. Persons who may be subject to involuntary emergency examination and treatment**

(a) **Persons Subject.**—Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

50 P.S. § 7301(a). That statute further defines a "clear and present danger" to oneself:

(b) **Determination of Clear and Present Danger**

\* \* \* \*

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

(ii) the person has attempted suicide and that there is the reasonable prob-

ability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or

(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

50 P.S. § 7301(b)(2).

■ ¶ 10 The Defendants' respective motions for summary judgment appear to coalesce around the proposition that the evidence does not raise a question of material fact concerning Patrick's intent to harm himself, thereby demonstrating that his conduct posed a "clear and present danger." The Defendants reasoned that, to the extent such a question is not shown, the evidence is not sufficient to show that their response in failing to seek an involuntary commitment under MHPA section 302 was grossly negligent. The trial court agreed, concluding that Patrick's conduct neither constituted an attempt to take his own life nor to commit "substantial mutilation," and accordingly, the defendants could not be deemed grossly negligent in their treatment decisions, which the court characterized as merely "judgment calls." Trial Court Opinion, 10/26/06, at 20–22. We do not find sufficient support in the

record to sustain the court's determination.

¶ 11 Concerning first the court's conclusion that subsection 301(b)(2)(iii) requires a showing that the patient, in this case Patrick, had attempted or achieved "substantial" mutilation, Zator contends that because the word "substantial" does not appear in the subsection's second sentence, the mutilation at issue need not be substantial in order to compel a determination of "clear and present danger." Brief for Appellant at 24. We agree with the trial court that the absence of the term "substantial" does not eliminate it as a consideration in evaluating either the patient's behavior or his threats. The section's second sentence, ("[A] clear and present danger shall be established by proof that the person has made threats to commit mutilation . . . ."), does not allow a definition less stringent than that imposed by the first sentence, but rather, defines what conduct may constitute an "attempt[ ] to mutilate [one]self substantially," as indicated in the prior sentence. 50 P.S. § 7301(b)(2)(iii). Hence, an "attempt[ ] to mutilate [one]self substantially" may be shown by a patient's "threats to commit mutilation" coupled with "acts which are in furtherance of the threat." *Id.* Thus, subsection (iii)'s second sentence serves to define attempt, not mutilation. Consequently, it does not modify the requirement of the subsection that mutilation, attempted or achieved, be "substantial."

¶ 12 Nevertheless, even accepting the trial court's interpretation of subsection (iii), we do not find support for the court's characterization of the evidence as insufficient to satisfy the "substantial mutilation" standard. Although the statute defines neither "mutilate" nor "substantial," their dictionary definitions offer adequate direction for statutory interpretation consistent with the Statutory Construction Act.

"Mutilate" is defined as **"1:** to cut off or permanently destroy a limb or essential part of <˜a body> <˜a statute>[.]" WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED, 1493, (1976). "Substantial" is pertinently defined as **"[1]b:** not seeming or imaginary: not illusive: REAL, TRUE <the ˜world> <a mere dream neither ˜nor practical> **c:** being of moment: IMPORTANT, ESSENTIAL[.]" *Id.* at 2280.

¶ 13 Applying these definitions in the context of this case, an act of "substantial mutilation" would appear to require the real and permanent destruction of a part of the patient's body. Although Patrick may not have sustained such injury as the immediate result of his acts of punching himself in the face and head and striking his head on a porch post, the record strongly suggests that such a result was Patrick's intention. In point of fact, he remarked to family members and his girlfriend during the incident that he wanted to be with his cousin, Damien, *who several years before had committed suicide.* Deposition of Renee Rudovitz, 1/9/04, at 62–63. The implication of this statement, which we find clear on its face, was strengthened by Patrick's response to Officer Rapoch. When Rapoch asked Patrick directly if he was going to harm himself, Patrick answered "yes." Deposition of Officer Frank Rapoch, 5/14/03, at 117–18. Coupled with the testimony of family members who saw bruising around Patrick's right eye after the incident, this evidence is more than sufficient to create a question of material fact that Patrick intended the real and permanent destruction of a part of his body, *i.e.,* his head, and that he had taken steps to achieve it by repeatedly striking his head on the porch post.

¶ 14 Additionally, although the record does not offer direct evidence that Patrick had ever attempted suicide, so as to bring this case within the ambit of subsection (ii), it does document Sharon Zator's report to hospital personnel that she *believed* her son had previously attempted suicide, as she found a large number of Ambien tablets inexplicably missing from Patrick's prescription bottle. Deposition of Sharon Zator, 5/13/03, at 14–17. Thus, contrary to the trial court's conclusion, the record does offer significant questions of fact suggesting that Patrick voiced suicidal ideations, attempted substantial self-mutilation, and that he expressed an intent to harm himself at least as late as his conversation with Officer Rapoch after Rapoch arrived to take him to the hospital. Moreover, given the testimony of both Officer Rapoch and Sharon Zator that they expressed concrete concerns and observations directly to hospital personnel that implicated involuntary commitment, we cannot dismiss or diminish the need for a factfinder to consider whether, in fact, the defendants' collective decision not to treat Patrick on an involuntary basis amounts to gross negligence. We conclude accordingly that the trial court erred in awarding summary judgment.

¶ 15 For the foregoing reasons, we reverse the trial court's award of summary judgment and remand this matter for trial.

¶ 16 Summary judgment **REVERSED.** Case **REMANDED** for further proceedings consistent with this Opinion. Jurisdiction **RELINQUISHED.**

¶ 17 Judge LALLY–GREEN Notes Her Dissent.