Joseph R. PAONE, Appellee,

v.

DEAN WITTER REYNOLDS, INC. and
Morgan Stanley Dean Witter, and
Robert Smith.

Appeal of Dean Witter Reynolds,
Inc., Appellant.

Superior Court of Pennsylvania.

Submitted March 5, 2001.

Filed Dec. 7, 2001.

Reargument Denied Feb. 15, 2002.

Sal Cognetti, Scranton, for appellant.

Timothy P. Polishan, Scranton, for Smith, appellee.

Lawrence J. Moran, Scranton, for Paone, appellee.

Before: MUSMANNO, TODD, and KELLY, JJ.

1. Morgan Stanley Dean Witter, also a defendant below, is the successor-in-interest to Dean Witter. We refer to Dean Witter and Morgan Stanley Dean Witter collectively as Dean Witter.

TODD, J.

¶ 1 Dean Witter Reynolds, Inc. ("Dean Witter")[1] appeals the order denying its petition to compel arbitration in this suit brought against it by Joseph R. Paone. We are called upon in this appeal to determine whether the rule articulated by our Supreme Court in *Flightways Corp. v. Keystone Helicopter Corp.*, 459 Pa. 660, 331 A.2d 184 (1975)—that an arbitration provision is enforceable in an agreement alleged to have been induced by fraud unless the allegation of fraud goes specifically to the arbitration provision—applies where the agreement is alleged to have arisen out of a confidential relationship. Upon review we vacate and remand.

¶ 2 On June 13, 1996, Paone's mother died. Paone was 45 and had lived alone with his mother all of his life. The farthest he had ever traveled out of his hometown of Archbald, Pennsylvania was to Wilkes Barre, Pennsylvania in 1969, a distance of about 25 miles.

¶ 3 Paone graduated high school after five years, with barely passing grades. With the exception of a minimum wage job at a cemetery from 1980 to 1990, he was unemployed for most of his life and was supported by his mother through her Army disability pension. His mother had handled all of his financial affairs. Until her death, he had never written a check.

¶ 4 Paone received approximately $72,332 in insurance death benefits from his mother. On the advice of his uncle, he decided to invest his money with Dean Witter and ultimately met with Robert Smith, an account executive in Dean Witter's Scranton, Pennsylvania office in July 1996.

¶ 5 Paone informed Smith that he wished to invest his inheritance, at that time $52,000. Smith visited Paone at his home and Paone signed a Dean Witter New Brokerage Account form. This form did not contain an arbitration provision. However, Smith and Paone met several times before Paone gave him any money to invest. According to his testimony, Paone thought that investing his money with Dean Witter would be like a savings account at a bank and he would earn interest on his money. Paone was hesitant to invest his money in stocks but claimed Smith "egged him on."

¶ 6 Over the course of late 1996 and early 1997, with Smith's assistance in making trips to the bank, Paone gave Smith approximately $72,000 to invest. In February 1997, at Smith's suggestion, Paone opened a Dean Witter Active Assets Account in order to set up a checking account. The trial court concluded that Paone never signed the Active Assets Account Agreement.

¶ 7 After the checking account was opened, Smith took the first four blank checks from Paone's checkbook, without Paone's knowledge, and in June 1997 wrote checks totaling approximately $25,000 to various credit card companies with whom Paone had no accounts. Smith later admitted to Paone that he had stolen this money. On another occasion, using the ruse of repairing fire damage to Paone's home, Smith obtained a blank check from Paone which Smith made out to another credit card company with whom Paone did not have an account for approximately $10,000. When asked about the checks on cross-examination, Smith invoked his Fifth Amendment privilege against self-incrimination, a privilege he repeatedly invoked at the hearing before the trial court. Also, Paone testified that Smith prepared Paone's 1997 tax return, telling Paone he could save him money.

¶ 8 Again at Smith's behest, Paone opened a Dean Witter Calls and Options Agreement in July 1997, having been told by Smith to "trust him".[2] Although the trial court found that this agreement did not contain an arbitration clause, this finding is contradicted by the record, as discussed below. Smith filled out the form, including false information about Paone's annual income and the value of his house, and Paone signed it.

¶ 9 Smith later admitted to "churning" Paone's account, but Paone testified he did not know what "churning" was and thought that Smith had just made an honest mistake. Indeed, Paone was unaware of the problems with Smith until May 1998 when Smith was fired from Dean Witter. Paone's new Dean Witter broker, Scott Rivitto, informed Paone that he had $52,000 in his account and owed Dean Witter $32,000 on a margin loan. At the time, Paone believed that he had over $100,000 in his account.

¶ 10 On December 7, 1999, Paone filed a complaint against Dean Witter and Smith alleging fraud and other claims and seeking money damages, including punitive damages. Dean Witter filed a petition to stay the proceedings and compel arbitration on January 27, 2000. This petition alleged that the Active Assets Account Application contained an enforceable binding arbitration agreement. On February 28, 2000, Smith filed preliminary objections alleging, *inter alia*, the existence of a binding agreement to arbitrate contained in

2. Throughout his testimony Paone stated that he told Smith "you're the expert here" and that he "trusted the man". (N.T. Hearing, 3/21/00, at 63, 64, 72.) Smith encouraged Paone throughout the relationship, telling him he was "good at this" or that he was making good money. (*Id.* at 61.)

the Calls and Options Agreement. The trial court held hearings on Dean Witter's petition to compel arbitration on March 21 and May 16, 2000. The trial court found that Paone had not signed the Active Assets Account Application and, therefore, that he was unaware of its arbitration provision. The court also found that Paone did sign the Calls and Options Agreement, but that the Calls and Options contract did not contain an arbitration provision.[3] Moreover, the court decided that both agreements were unenforceable as they were induced by fraud. Therefore, the trial court concluded that there was no binding agreement between the parties to arbitrate and denied Dean Witter's petition to compel arbitration on August 23, 2000. This timely appeal by Dean Witter followed.[4]

¶ 11 Dean Witter raises a single issue on appeal: "Whether the parties entered into an enforceable agreement to arbitrate that, under the mandatory provision of 42 Pa.C.S.A. § 7304(a), warrants an order compelling the parties to proceed with arbitration?"[5] (Brief for Appellant, at 6.)

■ ¶ 12 Dean Witter first argues that the trial court erroneously found that the Calls and Options Agreement did not contain an arbitration provision. The Calls and Options Agreement contains a statement on the front of the document in bold type that states, "This agreement contains an arbitration clause on the reverse side at paragraph six." (Options Agreement, R.R. 113a; Appellant's Brief, Exh. B). Paragraph six on the reverse side of the form reads in part:

> You agree that all controversies between you or your principals or agents and Dean Witter or its agents (including affiliated corporations) arising out of or concerning any of your accounts, orders or transactions, or the construction, performance, or breach of this or any other agreement between us, whether entered into before or after the date an account is opened, shall be determined by arbitration only before the New York Stock Exchange, Inc.; the National Associa-

---

**3.** Again, this finding is not supported by the record.

**4.** This interlocutory appeal is properly before us as it is an appeal from an order denying an application to compel common law arbitration. As we have explained in a similar case:

> Pennsylvania Rule of Appellate Procedure 311(a) provides that an interlocutory appeal may be taken as of right from, *inter alia*, "[a]n order which is made appealable by statute or general rule." Pa.R.A.P. 311(a)(8). Section 7320(a)(1) of the Uniform Arbitration Act provides in pertinent part that an appeal may be taken from "[a] court order denying an application to compel arbitration...." 42 Pa.C.S.A. § 7320(a)(1). Although the present case involves common law rather than statutory arbitration, Section 7342(a) of the Judicial Code, 42 Pa.C.S.A. § 7342(a), provides that Section 7320(a)(1) is applicable to such arbitration. Thus the order denying Appellants' petition to compel arbitration has

been made appealable by statute, and the present appeal is properly before us. *Hallo v. Flore*, 386 Pa.Super. 178, 562 A.2d 856 (1989), *appeal denied*, 525 Pa. 612, 577 A.2d 544 (1990).

*Goral v. Fox Ridge, Inc.*, 453 Pa.Super. 316, 320 n. 1, 683 A.2d 931, 933 n. 1 (1996).

**5.** 42 Pa.C.S.A. § 7304(a) states:

> **Compelling arbitration.**—On application to a court to compel arbitration made by a party showing an agreement described in section 7303 (relating to validity of agreement to arbitrate) and a showing that an opposing party refused to arbitrate, the court shall order the parties to proceed with arbitration. If the opposing party denies the existence of an agreement to arbitrate, the court shall proceed summarily to determine the issue so raised and shall order the parties to proceed with arbitration if it finds for the moving party. Otherwise, the application shall be denied.
>
> 42 Pa.C.S.A. § 7304(a).

tion of Securities Dealers, Inc.; or the Municipal Securities Rulemaking Board, as you may elect.

(*Id.*) It is clear, therefore, that the trial court's finding that the Calls and Options Agreement did not contain an arbitration clause is not supported by competent evidence and we must agree with Dean Witter that the agreement does, in fact, include an arbitration provision.

¶ 13 Refuting the trial court's conclusion that, regardless, the Calls and Options Agreement was induced by fraud, Dean Witter next contends that an attack on the validity of a contract for fraud does not invalidate an arbitration provision in the contract, unless the allegation of fraud goes specifically to the arbitration provision. Thus, Dean Witter concludes that its petition to compel arbitration should have been granted because Paone's allegations of fraud do not specifically target the arbitration provision.

¶ 14 In opposition, Paone asserts that his limited intelligence and experience coupled with Smith's financial expertise created a confidential relationship akin to a fiduciary duty. Paone maintains that this special relationship made the contracts at hand, and their respective arbitration clauses, voidable. Therefore, Paone argues there was no arbitration provision to enforce. As both Dean Witter and Paone rely on generally sound legal principles, this case presents a conflict between caselaw that regards an arbitration provision as enforceable even where an agreement is challenged as fraudulently induced, and caselaw that requires that an agreement borne of a confidential relationship be given special scrutiny.

■ ¶ 15 In *Flightways Corp. v. Keystone Helicopter Corp.*, 459 Pa. 660, 331 A.2d 184 (1975), our Supreme Court addressed the validity of a broad arbitration provision in an agreement challenged as fraudulently induced and described our limited review in such situations: "When one party to an agreement to arbitrate seeks to enjoin the other from proceeding to arbitration, judicial inquiry is limited to the questions of whether an agreement to arbitrate was entered into and whether the dispute involved falls within the scope of the arbitration provision." *Id.* at 663, 331 A.2d at 185 (citing *Borough of Ambridge Water Auth. v. J.Z. Columbia*, 458 Pa. 546, 328 A.2d 498 (1974)). The Court went on to hold that the arbitration clause "cannot be circumvented by an allegation that the contract was void ab initio because of fraud in the inducement or mutual mistake," *id.* at 663, 331 A.2d at 185, and quoted with approval the rule developed under a federal arbitration act:

"[A] general attack on a contract for fraud is to be decided under the applicable arbitration provision as a severable part of the contract and that only where the claim of fraud in the inducement goes specifically to the arbitration provision itself should it be adjudicated by the court rather than the arbitrator."

*Id.* at 663–64, 331 A.2d at 186 (quoting *Merritt–Chapman & Scott Corp. v. Pennsylvania Tpk. Comm'n*, 387 F.2d 768, 771 (3d Cir.1967)). These principles have been applied repeatedly. *See Smith v. Cumberland Group, Ltd.*, 455 Pa.Super. 276, 687 A.2d 1167 (1997) (citing *Flightways, supra*, for the proposition that an arbitration clause is separable from the contract and is not rescinded by an attempt to rescind the entire contract); *Anderson v. Erie Ins. Group*, 384 Pa.Super. 387, 558 A.2d 886 (1989) (citing *Flightways, supra*, in holding claims of fraud and misrepresentation must be submitted to an arbitrator where the contract contained a broad arbitration provision). Here, there was no allegation of fraud in the inducement going specifically to the arbitration provision. Thus,

*Flightways* would seemingly dictate that the provision be enforced.

¶ 16 However, in *Flightways* and the more recent cases citing to it, the agreements at issue were not the product of a confidential relationship, as is alleged here. Entirely different presumptions come into play when a confidential relationship is at issue.

■ ¶ 17 A contract that is the product of a confidential relationship [6] is presumptively voidable "unless the party seeking to sustain the validity of the transaction affirmatively demonstrates that it was fair under all of the circumstances and beyond the reach of suspicion." *Frowen v. Blank*, 493 Pa. 137, 145, 425 A.2d 412, 416 (1981). More precisely, "the proponent of the contract must prove by clear and convincing evidence 'that the contract was free, voluntary and an independent act of the other party, entered into with an understanding and knowledge of its nature, terms and consequences.'" *Biddle v. Johnsonbaugh*, 444 Pa.Super. 450, 456, 664 A.2d 159, 162 (1995) (quoting *Kees v. Green*, 365 Pa. 368, 375, 75 A.2d 602, 605 (1950)). In *Frowen*, the Supreme Court explained the basis for this presumption:

> When the relationship between the parties to an agreement is one of trust and confidence, the normal arm's length bargaining is not assumed, and overreaching by the dominant party for his benefit permits the aggrieved party to rescind the transaction. This is so because the presence of a confidential relationship negates the assumption that each party is acting in his own best interest.

*Frowen*, 493 Pa. at 144, 425 A.2d at 416 (citations omitted). Thus, "[o]nce a confidential relationship is shown to have existed, it then becomes the obligation of the party attempting to enforce the terms of the agreement to establish that there has not been a breach of that trust." *Id.* at 144, 425 A.2d at 416; *Iron Worker's Sav. and Loan Ass'n v. IWS, Inc.*, 424 Pa.Super. 255, 270, 622 A.2d 367, 375 (1993) (citing *Frowen*, 493 Pa. at 144, 425 A.2d at 416).

■ ¶ 18 Here, Dean Witter is attempting to enforce the arbitration provision of the Calls and Options Agreement. Despite the trial court's finding that a confidential relationship existed between Paone and Dean Witter, Dean Witter asks us to enforce the arbitration provision, but has not shown that it is "fair under all of the circumstances," *Frowen*, 493 Pa. at 145, 425 A.2d at 416, and that it was "entered into with an understanding and knowledge of its nature, terms and consequences." *Biddle*, 664 A.2d at 162. Under *Frowen* and related cases, it is Dean Witter's burden to make this showing. Under these circumstances, a mechanical application of *Flightways* may give Dean Witter the benefit of a term to which it is potentially not entitled; applying *Flightways* would imbue the arbitration provision with the status of having been bargained-for in an

**6.** Confidential relationships may be formed in a variety of circumstances which "cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line." *Basile v. H & R Block, Inc.*, 777 A.2d 95, 101 (Pa.Super.2001) (quoting *In re Estate of Scott*, 455 Pa. 429, 316 A.2d 883, 885 (1974)). Particularly relevant in the present case, this Court has noted:

> Both our Supreme Court and other courts have recognized that those who purport to give advice in business may engender confidential relations if others, by virtue of their own weakness or inability, the advisor's pretense of expertise, or a combination of both, invest such a level of trust that they seek no other counsel.

*Basile*, 777 A.2d at 102 (citing cases, including *Frowen, infra*).

agreement which *Frowen* presumes is entirely suspect.

■ ¶ 19 Further, as we discussed, in *Flightways* the Supreme Court limited a court's examination where an arbitration provision is challenged to "whether an agreement to arbitrate was *entered into* and whether the dispute involved falls within the scope of the arbitration provision." *Flightways*, 459 Pa. at 663, 331 A.2d at 185 (emphasis added). Here, it is true that Paone signed the Calls and Options Agreement. However, in the context of a confidential relationship, the fact that the party against whom an agreement is to be enforced signed the agreement is insufficient for its enforceability. *See Frowen*, 493 Pa. at 149, 425 A.2d at 418 (case remanded to determine if agreement executed in the context of confidential relationship was "fair, conscientious and beyond the reach of suspicion"); *In re Estate of Mihm*, 345 Pa.Super. 1, 497 A.2d 612 (1985) (affirming denial of specific performance of option agreement signed in context of confidential relationship because of agreement's inadequate price). Rather, it must be shown that the party had an "understanding and knowledge of its nature, terms and consequences," *Biddle*, 664 A.2d at 162, before the agreement may be enforced against him. In the context of a confidential relationship, an assessment of whether a contract was "entered into" vis-à-vis an arbitration provision must therefore be more demanding than simply assessing whether a party signed the agreement.[7] Otherwise, the presumptions and burden-shifting dictated by *Frowen* would be flouted and the mandate to gauge the understanding and knowledge of the weaker party regarding specific terms ignored.

■ ¶ 20 Therefore, we hold that the presumptions and burden-shifting prescribed in *Frowen* and related cases must take precedence over the general principle articulated in *Flightways* that an arbitration provision is enforceable absent an allegation of fraud going specifically to the arbitration provision. In reviewing an application to enforce an arbitration provision in an agreement that is alleged to be the product of a confidential relationship, the trial court must first determine, by way of a hearing or otherwise, whether the evidence supports a finding that there is a confidential relationship. If so, the trial court must determine whether the proponent of the arbitration provision (presumably the stronger party) has met its burden of showing that the provision is fair under all the circumstances, *Frowen*, 493 Pa. at 145, 425 A.2d at 416, that it was entered into with knowledge of its nature and consequences, *Biddle*, 664 A.2d at 162, and thus that the provision was not itself a result of a violation of the trust reposed in the confidential relationship. If this burden is not met, then the arbitration provision is unenforceable. Where this burden is met, or if the evidence does not support a finding that a confidential relationship exists, then *Flightways* dictates the enforceability of the arbitration provision.

¶ 21 Consequently, we vacate the trial court's order of August 23, 2000 and remand this case for a hearing wherein the parties may present evidence and Dean Witter must be given the opportunity to demonstrate, in accord with the principles set forth above, that the arbitration provision, which Dean Witter is attempting to enforce, is fair under the circumstances, was knowingly entered into, and thus was

---

7. We further note that in *Flightways* and the more recent cases we cited above, there was no dispute or question that the arbitration provision at issue was agreed to by the parties. *See Flightways,* 459 Pa. at 663, 331 A.2d at 185; *Smith,* 687 A.2d at 1171; *Anderson,* 558 A.2d at 889.

not the result of a breach of the confidential relationship between Dean Witter and Paone.

¶ 22 Order vacated. Case remanded with instructions. Jurisdiction relinquished.

¶ 23 Kelly, J. files a Dissenting Opinion.

KELLY, J., dissenting.

¶ 1 I depart from the majority disposition because I believe that where a contract contains an arbitration provision, any challenge to the validity of that contract must be submitted to arbitration unless the attack specifically targets the arbitration provision, even where a confidential relationship between the contracting parties exists. Hence, I dissent.

¶ 2 Our Supreme Court has stated:

It is unquestioned that arbitration is a process favored today in this Commonwealth to resolve disputes. By now it has become well established that settlement of disputes by arbitration are no longer deemed contrary to public policy. In fact, our statutes encourage arbitration and with our dockets crowded and in some jurisdictions congested, arbitration is favored by the courts.

*Office of Administration v. Labor Relations Board*, 528 Pa. 472, 480, 598 A.2d 1274, 1277–78 (1991). *See also Flightways Corp. v. Keystone Helicopter Corp.*, 459 Pa. 660, 331 A.2d 184 (1975); *Dickler v. Shearson Lehman Hutton, Inc.*, 408 Pa.Super. 286, 596 A.2d 860 (1991), *appeal denied*, 532 Pa. 663, 616 A.2d 984 (1992).

¶ 3 Although no case in this Commonwealth has specifically addressed the enforceability of an arbitration provision in the face of a general attack on a contract alleging the existence of a confidential relationship, there are cases that have addressed the enforceability of an arbitration provision in a contract that has been attacked as fraudulently induced. In those cases, Pennsylvania courts have consistently held an allegation that a contract is invalid as fraudulently induced does not affect the viability of an arbitration clause within that contract, unless the allegation of fraud specifically targets the arbitration provision and not just the contract generally. *Flightways, supra.* *See also Smith v. Cumberland Group Ltd.*, 455 Pa.Super. 276, 687 A.2d 1167 (1997) (citing *Flightways, supra* for proposition that arbitration clause is separable from contract and not rescinded by attempt to rescind entire contract); *Anderson v. Erie Ins. Group*, 384 Pa.Super. 387, 558 A.2d 886 (1989) (citing *Flightways, supra* in holding claims of fraud and misrepresentation must be submitted to arbitrator where contract contained broad arbitration provision). If a party is permitted to challenge the validity of a contract containing an arbitration provision in court rather than in arbitration, then the viability of arbitration provisions will be vitiated. *See generally, Flightways, supra;* and progeny.

¶ 4 Guided by Pennsylvania's strong policy favoring arbitration, the holdings of *Flightways, supra* and its progeny (reserving for the arbitrators general challenges to the validity of a contract), and to reinforce the vigor of arbitration clauses generally, I would send the instant dispute concerning the validity of the contract to arbitration.

¶ 5 I note also that the arbitration provision at issue includes a choice of law clause selecting New York law to govern the arbitration, and a clause limiting the selection of arbitrators to either the New York Stock Exchange, Inc., the National Association of Securities Dealers, Inc., or the Municipal Securities Rule Making Board. Such clauses limiting the selection of arbitrators are valid in New York as well as Pennsylvania. *See generally, Cowen & Co.*

 

*v. Anderson,* 76 N.Y.2d 318, 558 N.E.2d 27, 559 N.Y.S.2d 225 (1990); *Oscar Gruss & Son Inc. v. Rosendorf,* 183 A.D.2d 595, 584 N.Y.S.2d 790 (N.Y.A.D. 1 Dept.1992); *Williams v. Gruntal & Co.,* 447 Pa.Super. 357, 669 A.2d 387 (1995), *appeal denied,* 545 Pa. 665, 681 A.2d 179 (1996).

¶ 6 While I recognize why Appellee is hesitant to arbitrate his dispute before any of these bodies, I am confident that given the facts of this case, even the arbitration bodies named in the arbitration provision will be able to view the facts objectively and render a fair and just verdict. Accordingly, I dissent.