# Downes v. Morgan Stanley Dean Witter

*Stephen J. Springer,* for plaintiff.
*Alexander Bono,* for defendants.

HERRON, *J.,* September 23, 2002—Presently before the court is the petition for a temporary restraining order and to compel arbitration and to stay all proceedings, filed by defendants Morgan Stanley Dean Witter and Scott Martin. The underlying proceeding at issue involves the complaint of plaintiff Marguerita Downes for violations of Pennsylvania's UTPCPL, fraud and negligence.

The complaint alleges that plaintiff invested $200,000 with defendants and ended up after about two years with only $89.29 due to defendants' unauthorized margin trading with her funds. Defendants seek, under Pa.R.C.P. 1531, the Pennsylvania Uniform Arbitration Act, 42 Pa.C.S. §7304(a) and (d), and the Federal Arbitration Act, 9 U.S.C. §1 et seq., to enforce a purported arbitration agreement between them and plaintiff. Plaintiff argues that she never agreed to arbitrate because the agreement to arbitrate only binds clients of Morgan Stanley who, unlike her, opted for margin trading.

After considering the briefs, documents and arguments presented, this court denies defendants' petition for the reasons set forth below.

## FINDINGS OF FACT

### I. *The Parties*

(1) Plaintiff Marguerita Downes is a realtor and was, at all relevant times, a client of Morgan Stanley. N.T., May 28, 2002, p. 68; May 6, 2002, p. 75.[1]

(2) Defendant Morgan Stanley is an investment, financial services and stock brokerage firm.

(3) Defendant Martin was, at all relevant times, a financial advisor in the employment of Morgan Stanley. N.T., May 6, p. 5.

### II. *The Purported Agreements Between the Parties*

#### A. The Active Asset Account Application

(4) The active asset account application (AAA agreement) is a two-page application signed by Downes, on the first page, on March 25, 1999. MSDW exhibit 4.

(5) Section 1 of the AAA agreement shows a number of boxes to check off corresponding to the type of account chosen. The box in front of "individual" is checked off. *Id.*

---

1. All references to notes of testimony are to testimony and oral argument on defendants' petition, either on May 6, 2002, or May 28, 2002, as indicated.

(6) Section 2 shows the social security number of Downes. *Id.*

(7) Sections 3 and 4 show a number of privileges and services which the applicant may adopt by checking off a box in front of each of the options. *Id.*

(8) Section 3 is checked off to indicate the acceptance of: (1) a year-end summary of account activity; (2) active assets money trust; (3) check writing privileges; and, (4) pre-printed deposit slips. Other services such as credit card and direct deposit are declined, as indicated by an unchecked box in front of those options. *Id.*

(9) Section 4, sub-section E provides two boxes to check off. On separate lines, the applicant may check off either: "Yes, I am requesting margin privileges," or: "No, I do not wish margin privileges." *Id.*

(10) There is a check mark in the box which requests margin privileges. *Id.*

(11) Immediately below those statements referring to the margin privileges is the following statement:

*"The following applies only to clients who request and are approved for margin privileges:*

"I authorize Morgan Stanley Dean Witter to lend to itself or to others, either separately or in common, any holding in my account that Morgan Stanley Dean Witter may be carrying for me on margin. I understand that I may borrow against my account at the rates and terms explained in the client account agreement. I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY THE PRE-DISPUTE ARBITRATION CLAUSE APPEARING IN SECTION III OF THE AGREEMENT." *Id.* (emphasis and capitalization in original)

(12) Thus, according to the AAA agreement, the pre-dispute arbitration clause applies to margin accounts only. *Id.*

(13) Immediately below the above-cited paragraph, at the bottom of page 1 of the application, are Downes' signature and date. *Id.*

(14) Downes stipulated to the authenticity of that signature. N.T., May 6, p. 6.

(15) The second page of the application shows sections 5 through 8. Only section 5 is filled out with Downes' address and choices for checks (stubs, quantity, number showing on first check). Sections 6, 7 and 8 are left blank. There is no signature line at the bottom of page 2. MSDW, exhibit 4.

## B. The Client Account Agreement and the Arbitration Agreement

(16) Morgan Stanley sends a welcome package of documents to each customer soon after a new account is open. N.T., May 6, p. 12; N.T., May 28, p. 16 (testimony of Patricia Kloc, operations manager, responsible for new accounts, with Morgan Stanley at all relevant times).

(17) Morgan Stanley includes in the welcome package a cover letter and a client account agreement (CAA). *Id.;* MSDW, exhibit 2.

(18) The CAA that was effective when Downes opened an account with Morgan Stanley begins on the first page with an introductory paragraph, which states that section III applies "to all accounts requesting margin privileges." MSDW, exhibit 3; N.T., May 6, p. 9.

(19) Section III is entitled "margin privileges." At the very beginning of section III, it is stated that the section "only applies to those clients eligible and approved for margin privileges." MSDW, exhibit 3, section III.

(20) Section III is the only section in the CAA which discusses arbitration. MSDW, exhibit 3.

(21) Thus, according to the CAA, the agreement to arbitrate applies solely to clients who request margin privileges. MSDW, exhibit 3; see also, N.T., May 6, p. 30 (testimony of Martin).

(22) Section III begins with a paragraph warning that "[m]argin trading is not for everyone." MSDW, exhibit 3, section III.

(23) Section III contains a sub-section entitled "arbitration," which lists disclosures related to arbitration as required by industry regulations. *Id.*

(24) Section III also contains a sub-section entitled "arbitration of controversies," which contains the arbitration clause at issue in this case and referred to in the AAA agreement. *Id.;* MSDW, exhibit 4.

(25) Downes testified that she never received the CAA either from Martin or directly from Morgan Stanley through the mail. N.T., May 6, p. 78; N.T., May 28, p. 58.

(26) There is no evidence in the record that Downes ever received the CAA.

C. The Margin Disclosure Statement

(27) The margin disclosure statement is a one-page document which is only included in the welcome pack-

age when clients have requested margin account privileges. N.T., May 28, p. 20.

(28) The margin disclosure statement produced by defendants was a copy of a 2001 document and not what might have been supplied to a client who opened an account when Downes did in March of 1999. MSDW, exhibit 2.

(29) The margin disclosure statement briefly explains margin trading and mostly highlights the risks involved in margin trading. *Id.*

(30) Martin never discussed this statement with Downes or any equivalent statement existent at the time Downes opened her account nor did he discuss with her any of the risks of margin trading as covered by the statement. N.T., May 28, pp. 76-77.

(31) Patricia Kloc, Morgan Stanley's operations manager, testified that when a customer did not request margin privileges, Morgan Stanley did not send the customer a margin disclosure statement. N.T., May 28, p. 20.

(32) Downes testified that she never received a margin disclosure statement. N.T., May 28, pp. 58-59.

(33) There is no evidence in the record that Downes ever received the margin disclosure statement.

III. *The Relationship Between the Parties*

A. The Onset of the Relationship

(34) Downes' first contact with Martin was a telephone conversation she initiated on being referred to Martin by a friend of hers and former client of Martin's. N.T., May 6, p. 5; N.T., May 28, pp. 49-50.

(35) During that conversation, Downes supplied Martin with information allowing him to open a new account for her and conduct one initial stock trade. *Id.*

(36) Prior to that time, Downes had maintained a stock brokerage account with Merrill Lynch. N.T., May 6, p. 6; N.T., May 28, pp. 51, 55.

(37) Martin and Downes met twice subsequent to their phone conversation to transfer her funds from Merrill Lynch and set up an active asset account, which is Morgan Stanley protocol when a new account is opened. N.T., May 6, pp. 7, 75-76.

(38) During their second meeting, Downes and Martin had a discussion regarding her new account and Downes signed the active asset account application or AAA agreement. *Id.;* N.T., May 28, pp. 51-52; MSDW, exhibit 4.

(39) During the meeting, Downes and Martin discussed privileges flowing from the account such as account writing privileges, pre-printed deposit slips, a debit card, and a credit card. N.T., May 6, pp. 7-8.

(40) Downes and Martin also discussed her investment philosophy and what she was looking for in her new relationship with Morgan Stanley. N.T., May 6, p. 77; N.T., May 28, pp. 51-52.

(41) Downes testified that she told Martin that she was a recently divorced woman, whose husband always took care of finances for her, that she was investing all the money she had, and thus was looking for conservative, low-risk investment. N.T., May 6, pp. 47, 77; N.T., May 28, pp. 51-52.

(42) Downes also purportedly told Martin that she needed someone she could trust and "he assured [her] that he was a good candidate for the job." N.T., May 28, p. 52.

(43) Downes testified that she had never traded on margin before opening an account with Morgan Stanley nor had she understood the term margin trading. N.T., May 28, p. 55.

(44) Martin conceded that Downes related to him that she did not borrow money nor wanted to put her nest egg at risk. N.T., May 6, p. 47.

(45) Martin testified that margin trading is not "low risk." N.T., May 28, p. 77.

(46) Downes and Martin had conflicting testimony as to whether they had any discussion of margin trading privileges during the meeting. N.T., May 28, pp. 55-57, 72-74; N.T., May 6, p. 46.

(47) Martin claims that he explained margin privileges and margin trading to Downes before she signed the AAA agreement. N.T., May 6, pp. 15-16; N.T., May 28, p. 74.

(48) Downes claims that Martin never discussed margin trading or privileges with her at the time she signed the AAA agreement. N.T., May 28, p. 56.

(49) Although Martin conceded that Downes related to him her wishes not to borrow money nor put her nest egg at risk, Martin claimed that Downes considered margin privileges for overdraft protection and as leverage for additional stock purchases. N.T., May 6, pp. 7-8; N.T., May 28, pp. 72-74.

(50) Downes testified that the box for margin privileges on the AAA agreement was not checked off either

by her or Martin at the time she signed on the agreement. N.T., May 28, pp. 22-23, 55-57.

(51) Martin testified that Downes signed the AAA agreement at the meeting, but did not specifically refute her testimony that the pertinent box for margin privileges was not filled in at the time Downes signed the AAA agreement. N.T., May 6, pp. 6-7, 15-16; N.T., May 28, pp. 72-74.

(52) Downes did not obtain a copy of the AAA agreement on the day she signed it. N.T., May 28, p. 58.

(53) Martin did not discuss the subject of arbitration with Downes at any point. N.T., May 6, pp. 31-32, 34.

(54) Martin testified that Downes would not be bound by arbitration if she did not request margin privileges. N.T., May 6, p. 30.

### B. The Subsequent Margin Trading in Downes' Account

(55) Morgan Stanley sends monthly account statements to their clients. N.T., May 6, p. 17.

(56) Margin trading was first reflected in the account statements of Downes in July 2000, more than 15 months after she opened her account in March of 1999. N.T., May 6, pp. 16-17, 36.

(57) The account statement for July 2000 reflected a margin loan of $94,390.14 and margin interest charges of $310.44. MSDW, exhibit 6.

(58) Downes noted question marks on her statement as well as some calculations apparently aimed at understanding the impact of the margin loan on the total value

of her assets. Plaintiff's exhibit 3(D); N.T., May 28, pp. 59-60.

(59) Downes testified that she sought advice from her neighbor, who was a retired chief financial officer, to understand what the margin entries meant. N.T., May 28, p. 62.

(60) Downes further testified that she then contacted Martin to discuss the margin loan and margin interest entries on her statement. N.T., May 28, pp. 61-62.

(61) Martin then apparently asked her to fax over the statement to him. *Id.*

(62) The July statement reflects Downes' handwritten fax number for Martin, which begins with the same area code and prefix as Martin's printed phone number at the top of the first page of that statement. Plaintiff's exhibit 3(D).

(63) Downes testified that she then had a phone conversation with Martin about the statement after he received it. N.T., May 28, p. 62.

(64) Purportedly, Martin was shocked that she knew what margin meant and said: "Oh, you know what margin interest is?" *Id.*

(65) Additionally, he purportedly told her that the margin interest on her statement was a "computer glitch" that would be corrected. N.T., May 28, p. 63.

(66) It was not clear from Martin's testimony during the first hearing, on May 6, 2002, whether he recalls having any such conversation with Downes, or whether he merely does not recall the terms of that conversation. N.T., May 6, pp. 36-37.

(67) During the second hearing of May 28, 2002, Martin testified that he remembered her calling him regarding her July statement but that he never told her "Oh, you know what margin interest is?" because he would "never say that, talk like that, to a client." N.T., May 28, p. 77.

(68) The August 2000 statement again reflected margin trading and the margin interest was higher than in the July account statement. MSDW, exhibit 6.

(69) Downes contacted Martin to discuss it and he stopped by to go over the statement with her. N.T., May 28, pp. 64-65.

(70) Downes testified that, again, Martin told her that any reflection on her statements of margin activity was a mistake, "a computer glitch," then added that he also had mistakenly mixed her funds with those of someone else, and that he would correct the error. N.T., May 28, p. 66.

(71) Downes scribbled down on her August statement some notes of this discussion. N.T., May 28, p. 65.

(72) Specifically, the August statement reflects Downes' noting in her handwriting: "next month look for no margin," just as Martin purportedly told her. *Id.;* plaintiff's exhibit 3(E).

(73) The August statement also shows Downes had written "incorrect" next to the margin interest entry. Plaintiff's exhibit 3(E).

(74) Martin acknowledges meeting with Downes over her August statement but testified "not for that reason" when asked if he went to meet with Downes because "there was a second month in which there was a margin interest loan." N.T., May 6, p. 37.

(75) Instead, Martin testified, they met roughly on a monthly basis "for a while" to go through her statements. N.T., May 6, p. 37.

(76) At the first hearing, on May 6, Martin testified that he does not remember specifically what was discussed. He does not remember, for example, whether he told Downes that the margin interest was incorrect. Then, on May 28, Martin testified that he never conceded to Downes that he had made mistakes regarding her account. N.T., May 6, p. 39; N.T., May 28, pp. 79-80.

(77) Martin, nonetheless, testified that at the meeting with Downes relating to the August statement, "we probably spoke about having less margin," but he remembers specifically that he never told her that "you are not going to have any margin." N.T., May 6, pp. 39-40.

(78) The margin trading continued through April 2001. N.T., May 28, p. 18.

(79) The dollar amount for "margin loan" never reached its August 2000 high, but rather went down then increased again in March and April 2001. MSDW, exhibit 6.

### IV. *The Court's Findings of Fact As To the Conflicting Testimony*

(80) The court finds Downes' testimony credible. The court believes her testimony as to the matters related in paragraphs 38-39 above with respect to the meeting with Martin during which she asked for secure and conservative investments. See this opinion, ¶¶41-45, 49.

(81) Downes signed the AAA agreement without checking off the box to request margin privileges and, at

some point after the execution of the agreement, the box for margin privileges was checked off by someone other than Downes and not in her presence or according to her instructions. *Id.,* ¶¶46-51, 56.

(82) Downes' testimony as to the contacts and discussions with Martin when she received her July and August statements reflecting margin activity is credible and serves to confirm and corroborate the fact that she had never opted for margin privileges. *Id.,* ¶¶60-79.

## DISCUSSION

### I. *Legal Standards*

#### A. Standards for a Preliminary Injunction

To be entitled to a preliminary injunction, as governed by Pa.R.C.P. 1531, a petitioner must satisfy a four-part test:

(1) The petitioner has a clear right to relief;

(2) The preliminary injunction is necessary to prevent immediate and irreparable harm that cannot be compensated by monetary damages;

(3) A greater injury will result by refusing to issue the injunction; and

(4) The injunction will restore the parties to the status quo as it existed prior to the wrongful conduct. See *Greco v. Hazleton City Authority,* 721 A.2d 399, 401 n.5 (Pa. Commw. 1998); *Valley Forge Historical Society v. Washington Memorial Chapel,* 493 Pa. 491, 500, 426 A.2d 1123, 1128 (1981). In addition, before any injunction becomes effective, a petitioner is required to file a bond

or deposit a fixed amount of legal tender with the prothonotary. Pa.R.C.P. 1531(b). Finally, requisites of a preliminary injunction are cumulative; thus, if one element is lacking, relief may not be granted. *Leonard v. Thornburgh*, 75 Pa. Commw. 553, 463 A.2d 77 (1983).

B. Standards for Enforcing Arbitration Agreements

Statutory law mandates that courts stay any proceedings involving issues allegedly subject to arbitration and proceed summarily to determine the existence and validity of an agreement to arbitrate. 42 Pa.C.S. §§7304(a) and (d); 9 U.S.C. §3. The threshold issue of the validity of the agreement to arbitrate is "a matter of contract and, as such, it is for the court to determine whether an express agreement between the parties to arbitrate exists." *Smith v. Cumberland Group Ltd.*, 455 Pa. Super. 276, 284, 687 A.2d 1167, 1171 (1997). Indeed, a written agreement to subject any existing controversy to arbitration is "valid, enforceable, and irrevocable, *save upon such grounds as exist at law or in equity relating to the validity, enforceability or revocation of any contract.*" 42 Pa.C.S. §7303 (emphasis added); see also, 9 U.S.C. §2. Specifically, arbitration agreements are to be found valid only where there is "clear, express and unequivocal intent of the parties as manifested by the writing itself." *Midomo Co. v. Presbyterian Housing Development Co.*, 739 A.2d 180, 190 (Pa. Super. 1999). Furthermore, the burden to establish a valid agreement to arbitrate falls upon the party seeking to enforce it. *Goldstein v. Depository Trust Company*, 717 A.2d 1063, 1067 (Pa. Super. 1998).

## C. Standards for Introducing Parol Evidence

Under the parol evidence rule, alleged prior or contemporaneous oral representation concerning subjects specifically dealt with in a written contract is inadmissible to vary the terms of the contract. *1726 Cherry Street Partnership v. Bell Atlantic Properties Inc.,* 439 Pa. Super. 141, 145, 653 A.2d 663, 665 (1995). However, parol evidence is admitted to avoid or modify the terms of that contract "where it is alleged that the parties agreed that those representations would be included in the written agreement but were omitted by fraud, accident or mistake." *Id.* at 147, 653 A.2d at 666.

Fraud in the execution is distinguished from fraud in the inducement. Fraud in the execution occurs when the party proffering the evidence contends that he or she signed an agreement with the belief that it contained the terms and conditions agreed upon during the negotiations leading to the agreement, when in fact, the agreement, on its face, represented otherwise. *Id.;* see also, *Iron Workers' Savings and Loan Association v. IWS Inc.,* 424 Pa. Super. 255, 264-65, 622 A.2d 367, 372-73 (1993) (where allegations of fraudulent inducement related that plaintiff executed a contract with the knowledge that the written agreement reflected different terms than earlier allegedly fraudulent representations). Fraud in the inducement, on the other hand, occurs where the party proffering the evidence alleges he or she was fraudulently misled during the negotiations leading up to the agreement and would not have entered into the agreement otherwise yet the agreement is consistent on its face with those fraudulent misrepresentations. *Id.* In Pennsylvania, only

where fraud in the execution is alleged is parol evidence admissible. *HCB Contractors v. Liberty Place Hotel Associates,* 539 Pa. 395, 398, 652 A.2d 1278, 1279 (1995); *Iron Workers* at 264-65, 622 A.2d at 372-73.

Fraud must be established by clear and convincing evidence albeit rarely by direct evidence. *Rohm and Haas Co. v. Continental Casualty Co.,* 566 Pa. 464, 476, 781 A.2d 1172, 1179 (2001). Fraud at the time of the transaction can be inferred from the totality of the circumstances surrounding the transaction, including subsequent conduct. *Denny v. Cavalieri,* 297 Pa. Super. 129, 134, 443 A.2d 333, 335-36 (1982). To that effect, "[t]rial courts are in the best position both to find the facts, and also determine their weight and credibility." *West Conshohocken Restaurant Associates Inc. v. Flanigan,* 737 A.2d 1245, 1248 (Pa. Super. 1999) (citing *Commonwealth v. 5043 Anderson Rd.,* 556 Pa. 335, 337, 728 A.2d 907, 909 (1999)).

## II. *Analysis*

Defendants' right to relief rests upon whether there is a valid agreement to arbitrate disputes between the parties. This court agrees with plaintiff that the agreement to arbitrate applies only to clients who request margin privileges. See MSDW, exhibit 3, section 3; MSDW, exhibit 4, section 4. In fact, defendant Martin conceded as much at the hearing held on May 6, 2002. N.T., May 6, p. 30. The determination of whether plaintiff agreed to arbitrate her disputes with defendants thus begins with whether plaintiff requested margin privileges. Defendants contend that plaintiff requested margin privileges, as evidenced by the box checked off in her AAA agree-

ment, right above her signature. *Id.* Plaintiff responds that she never requested margin privileges when she signed the AAA agreement and that the box was not checked off at the time she signed the AAA agreement. N.T., May 28, pp. 22, 55.

Because the AAA agreement covers the specific topics of margin trading and of arbitration, plaintiff's representation that she had not requested margin privileges is subject to the parol evidence rule. "[T]he written contract, if unambiguous, must be held to express all of the negotiations, conversations, and agreements made prior to its execution, and neither oral testimony, nor prior written agreements, or other writings, are admissible to explain or vary the terms of the contract." *1726 Cherry Street Partnership v. Bell Atlantic Properties Inc.,* 439 Pa. Super. 141, 145, 653 A.2d 663, 665 (1995). Nonetheless, our Supreme Court has held that where fraud in the execution is alleged, parol evidence is admissible to contradict the terms of the contract. *HCB Contractors* at 398, 652 A.2d at 1279; see also, *Iron Workers* at 264-65, 622 A.2d at 372-73.

Plaintiff is alleging that she entered into a contract which did not reflect any affirmative request for margin privileges.[2] Plaintiff's memorandum of law in opposi-

---

2. Neither in her memorandum briefs nor in the hearings before the court had plaintiff articulated that she was pleading fraud in the execution to introduce parol evidence. Nonetheless, plaintiff always maintained that defendant Martin altered the agreement by checking off the request for margin privileges after plaintiff signed it, in effect, thus, pleading fraud in the execution of the agreement. See this opinion, ¶50; plaintiff's memo, July 9, pp. 2, 13, 18, 22. Plaintiff need not use the exact legally conclusive words in their pleadings. *Price v. Ross,* 339 Pa. Super. 461, 463-64, 489 A.2d 252, 253-54 (1985).

tion to defendants' motion to compel arbitration (July 9), pp. 1, 17. That agreement was subsequently fraudulently altered by the addition of a checkmark in front of the request for margin privileges. *Id.* Had plaintiff merely asserted that "Martin lulled Downes into signing the application form," while not contesting the checkmark, in effect exclusively pleading fraud in the inducement, plaintiff's parol evidence would not be admissible. Plaintiff's memo, p. 21. A party cannot "justifiably rely upon prior oral representations, yet sign a contract denying the existence of these exact representations." *LeDonne v. Kessler,* 256 Pa. Super. 280, 294 n.10, 389 A.2d 1123, 1130 n.10 (1978).

Instead, plaintiff has effectively pled fraud in the execution because she claims that the agreement she signed is not the agreement submitted by defendants and proffered as the contract between them. This court has stated that fraud in the execution occurs where "the plaintiffs must have thought that the document they signed contained the disputed terms." *PNC Bank v. Is Industries Inc., PNC Bank v. Snyder,* no. 1333, control no. 061876, no. 1342, control no. 061875 (Phila. C.P., Sheppard J., Feb. 14, 2001). Indeed, fraud in the execution is often described as a factual pattern where misrepresentations were made prior to the agreement then omitted from the written contract. In the case sub judice, unlike the habitual fraud in the execution pattern of omitted terms, plaintiff alleges that the document she signed was altered after the fact to *add* terms. It is, nonetheless, fraud in the execution because plaintiff is alleging that she signed a document which was different on its face than the negotiations and representations the parties had. If

anything, this is an egregious illustration of the case. Thus, plaintiff may introduce parol evidence to alter the terms of the contract.

Accordingly, the court admitted Downes' testimony as to her non-adoption of margin trading and found it credible.[3] Downes was employed and did not need to use her investment for growth to cover daily living expenses. See this opinion, ¶1. This was her nest egg. *Id.*, ¶44. Downes expressly rejected risky investments and credit, as was corroborated by Martin. *Id.* Margin trading is risky, again, as conceded by Martin. See this opinion, ¶45. Downes was putting everything she had into her new account with Morgan Stanley. *Id.*, ¶41. In the margin disclosure statement, Morgan Stanley explains:

"When you purchase securities, you may pay for the securities in full or you may borrow part of the purchase price from us. If you chose [sic] to borrow funds from Morgan Stanley, you will open a margin account with us. The securities in your account are the firm's collateral for the loan to you." MSDW, exhibit 2.

The record does not reflect Downes' receipt of this document, which is exclusively sent to clients who request margin privileges. Furthermore, Martin testified that he never addressed the contents of the statements in the margin disclosure statement with Downes. N.T., May 28, pp. 76-77. Downes did not even know what margin

---

3. The testimony doubly serves to establish fraud in the execution and the negation of what the written document proffers, the option of margin trading, since the fraudulent alteration went to the term the parties are contesting.

trading meant at the time she entered into the agreement. See this opinion, ¶¶59, 82.

Defendants' exhibit 3, section 3, underscores the complexity, sophistication, and high risk involved in margin trading. MSDW, exhibit 3, section 3. It begins as follows: "Margin trading is not for everyone. You should examine your investment objectives, financial resources and risk tolerance to determine whether margin trading is appropriate for you." *Id.* Another of defendants' exhibits, the margin disclosure statement, lists harrowing hypothetical consequences of margin trading. To wit:

"You can lose more funds than you deposit in your margin account.

"The firm can force the sale of securities or other assets in your account(s).

"The firm can sell your securities or other assets without contacting you.

"You are not entitled to choose which securities or other assets in your account(s) are liquidated or sold to meet a margin call.

"The firm can increase its 'house' maintenance margin requirements at any time and is not required to provide you advance written notice.

"You are not entitled to an extension of time on a margin call." MSDW, exhibit 2.

Plaintiff maintains that she never received this document. N.T., May 28, pp. 58-59. Defendants claim otherwise. N.T., May 6, pp. 6-8, 14-15, 55. The court was presented with numerous uncontested evidence and testimony of factors that make it inconceivable that Downes would have opted for margin trading. Nor is she more

likely to have opted for it had she actually received that margin disclosure statement as defendants claim. Accordingly, the court believes Downes in that she did not check off the box for margin trading before signing upon the agreement.

Downes' subsequent behavior when finding out what was happening with her account supports the conclusion that she never discussed margin trading with Martin, never agreed to trade on margin, nor checked that box accordingly before signing the AAA agreement. The claim advanced by Martin that she was interested in leverage is not consistent with his concession that she had an aversion to high risk. N.T., May 6, pp. 7-8; N.T., May 28, pp. 72-74. Nor does the fact that she contacted him only twice about the margin trading entries on her statements undermine her assertion that she wanted him to stop trading on margin for her. Response of defendants to plaintiff's proposed findings of fact, conclusions of law and memorandum of law (Aug. 1, 2002), p. 4.

The record amply supports by clear and convincing evidence that Downes never checked off the box for option trading prior to signing the agreement. Her related statements, now admissible, also establish that she never discussed, let alone authorized, any margin trading with her money. Consequently, and according to defendants' own procedure for adopting the arbitration agreement, the arbitration agreement is not triggered and plaintiff is not bound to arbitrate her dispute with defendants.

Defendants, nonetheless, argue that under *Flightways Corp. v. Keystone Helicopter Corp.*, plaintiff must plead fraud as to the arbitration clause specifically rather than

fraud as to the contract in general. *Flightways Corp. v. Keystone Helicopter Corp.,* 459 Pa. 660, 331 A.2d 184 (1975). Thus, defendants claim, even if plaintiff could establish fraud in the execution of the contract between the parties, plaintiff is nevertheless still bound by the agreement to arbitrate.

Under *Flightways:*

"[A] general attack on a contract for fraud is to be decided under the applicable arbitration provision as a severable part of the contract and . . . only where the claim of fraud in the inducement goes specifically to the arbitration provision itself should it be adjudicated by the court rather than the arbitrator." *Flightways* at 633, 331 A.2d at 185.

This court does not read *Flightways* to find a pleading of fraud in the contract and one of fraudulent inducement in the agreement to arbitrate to be mutually exclusive. *Id. Flightways* merely states that the former allegation would be insufficient per se to void the agreement to arbitrate. *Id.* Furthermore, whereas the distinction between fraud in the execution and fraud in the inducement is critical for purposes of the parol evidence rule, it is irrelevant for purposes of voiding an arbitration agreement under *Flightways. Id.* In *Flightways,* the relevant distinction is whether fraud is alleged as to the arbitration clause itself rather than the contract in general. *Id.*

In the case before the court, plaintiff has pled both because in pleading fraud in the execution of the contract, plaintiff pleads that she was fraudulently induced into agreeing to arbitrate. Undeniably, the agreement to arbitrate here was implied in the agreement to trade on

margin. MSDW, exhibit 3. As readily admitted and argued by defendants, it is from the "check" in the margin trading box, the agreement to margin privileges, that the agreement to arbitrate was incorporated:

"Q. And would you agree, sir, that if Ms. Downes did not request or wasn't approved for margin privileges that this particular clause [the pre-dispute arbitration clause] would not apply as you understand this clause?

"A. If she did not approve or request, yes." N.T., May 6, p. 30.

Plaintiff's claim of fraud, thus, does go "specifically to the arbitration provision itself." *Flightways* at 663, 331 A.2d at 185-86. Plaintiff simply had no other place or occasion to contract to arbitrate. To attack the arbitration agreement directly, as required by *Flightways,* here means to attack the agreement for margin privileges. *Id.* The court was, thus, properly and directly adjudicating the existence of an agreement to arbitrate. See 42 Pa.C.S. §7303; *Goldstein v. Depository Trust Company,* 717 A.2d 1063 (Pa. Super. 1998); *Smith v. Cumberland Group Ltd.,* 455 Pa. Super. 276, 687 A.2d 1167 (1997). Finally, defendants did not meet their burden to establish a valid agreement to arbitrate. *Goldstein* at 1067. "[A] party who can establish that he did not agree to arbitrate, . . . may be entitled to enjoin an arbitration proceeding." *Flightways* at 663, 331 A.2d at 185.[4]

---

4. Plaintiff has further argued that, were this court to find plaintiff bound by the arbitration agreement under *Flightways,* the court should, under *Paone v. Dean Witter Reynolds Inc.,* find a confidential or fiduciary relationship between the parties, and thus allow, as in *Paone,* an exception to the rule stated in *Flightways.* Plaintiff's reply brief, Aug. 2, 2002; *Flightways Corp. v. Keystone Helicopter Corp.,* 459 Pa. 660,

## CONCLUSIONS OF LAW

(1) This court is the proper forum to determine whether the parties entered into an agreement to arbitrate.

(2) The arbitration agreement is only applicable to clients of defendants who request margin privileges.

(3) Plaintiff showed by clear and convincing evidence that defendants committed fraud in the execution of the AAA agreement by altering the agreement subsequent to plaintiff signing upon it.

(4) Thus, plaintiff may introduce parol evidence to contradict the terms of the written agreement.

(5) Plaintiff's credible oral testimony was admissible to establish that she did not request margin privileges.

(6) Because plaintiff did not request margin privileges, plaintiff is not bound by the arbitration agreement.

(7) Defendants' fraudulent alteration of the document plaintiff signed represents fraud in the execution of the agreement to arbitrate.

(8) There is no clear, express, and unequivocal intent of the parties to arbitrate disputes.

(9) There is no valid contract to arbitrate between the parties.

---

331 A.2d 184 (1975); *Paone v. Dean Witter Reynolds Inc.,* 789 A.2d 221 (Pa. Super. 2001). Defendants refute that argument, asserting, inter alia, that the facts in this case are dramatically different from *Paone* and, consequently, the court could not find a confidential relationship between the parties. Reply of defendants to plaintiff's reply brief, Aug. 15, 2002; *Paone v. Dean Witter Reynolds Inc.,* 789 A.2d 221 (Pa. Super. 2001). The court does not find it necessary to reach a decision on whether a confidential relationship existed between the parties because, under the law, plaintiff has established that she was fraudulently induced into an arbitration agreement, and the agreement is, thus, void.

## CONCLUSION

This court will enter a contemporaneous order in accord with these findings of fact and conclusions of law.

## ORDER

And now, September 23, 2002, upon consideration of defendants' petition for temporary restraining order and preliminary injunction to compel arbitration and stay all other proceedings, plaintiff's response, the parties' replies and sur-replies, the respective memoranda, all matters of record, and after two hearings, and in accord with the contemporaneous findings of fact and conclusions of law, it is ordered that:

(1) Defendants' petition is denied;

(2) The parties did not enter into a binding agreement to arbitrate;

(3) Defendants are directed to file an answer to the complaint within 20 days of this order.